## GROFF v. MUNFORD.

### No. 283.

Circuit Court of Appeals, Second Circuit.

July 19, 1945.

Samuel O. Clark, Asst. Atty. Gen., Sewall Key, Helen R. Carloss, and William B. Waldo, Sp. Assts. to Atty. Gen., and Robert P. Butler, U. S. Atty., and Edward J. Lonergan, Asst. U. S. Atty., both of Hartford, Conn., for defendant-appellant.

Alfred H. Phillips, of New York City (Richard C. Hunt and Alfred H. Phillips, both of New York City, of counsel), for plaintiff-appellee-appellant.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The question to be determined on this appeal is whether the average mean selling price of $23.375 per share on the Montreal Stock Exchange for November 10 and 12, 1936 (November 11 being a holiday) should be taken as the value of stock of Electrolux Corporation in assessing the gift tax on 14,000 shares given by Charles G. Groft to his wife on November 11. On November 10, only 145 shares were sold on the Montreal Exchange and on November 12, 250 shares. During the whole of November 5,861 shares were sold on that Exchange; during December 5,927 shares; during January, 1937, 3,692 shares; during February 5,715 shares, and during March 3,-550 shares. The mean average price between high and low during December was $23.75; during January $22.94; during February $21.75 and during March $18.75.

The parties stipulated for the trial that a member of the Montreal Exchange who was an expert familiar with trading in Electrolux stock, would testify that if the 14,000 shares had been added to the supply they could not have been sold within a week of November 11, 1936, for more than $17.25 per share and that $17.25 per share represented the fair market value of the block of stock on November 11, 1936. It was also stipulated that a member of a firm of

brokers active on the Montreal Exchange would testify that there was no over-the-counter trading in this stock, that the trading in it on the Exchange was extremely small and that a broker could not have sold the 14,000 shares of stock at a higher price than $17.25 per share had he taken a period of not more than several months to complete the transaction. A broker named Grace testified that as large a block of Electrolux stock as 14,000 shares, would in his opinion have been worth between $16 and $18 per share as of November 11, 1936, if "peddled advantageously and without pressure on the market" over a period of from four to six months. Finally, Robert Horner, a dealer in securities, testified that the block of 14,000 shares testified that the block of 14,000 shares could have been sold on the Montreal Exchange at $17 or $18 per share, if disposed of within from four to eight months after November 11, but that such a block of stock might have been distributed in the American Market at $23 to $24 per share in a so-called "best efforts" deal by organizing a group of brokers to create interest in the stock and make a market, though their charges would have amounted to $3 per share. Under such an arrangement a dealer would contract to buy the stock at $23 or $24 per share and to take and pay for it over a period of a number of months. Horner gave as an example of a "best efforts" deal a purchase by himself of a block of some 20,000 shares of this very Electrolux stock in the year 1938 under an arrangement in which he had an option to purchase at the last sales price on the Montreal Exchange less a broker's fee of $2 per share. The court below regarded the reason for a fee of $2, rather than one of $3 per share, to be that the dealer who had charged $2 had only exercised an option and had not undertaken an absolute obligation to purchase.

Upon the foregoing record Judge Hincks held that "the prices paid on the Montreal Exchange for * * * small lots of the stock * * * on November 12, 1936 and during the ensuing period, were not a proper criterion of the value of the block of 14,000 shares on which the tax here in question was imposed. For if a block of such size had been unloaded on the Montreal Stock Market through brokers in the usual course within a narrow period of time, undoubtedly the prices recorded for the thin volume of actual transactions would have been substantially depressed." He made the specific findings set forth below.[1]

The issue in the appeal by the administrator of the Collector is whether the sales price per share of the Electrolux stock on the Montreal Stock Exchange on or about

---

[1] 12. On November 11, 1936, the only commercial procedures generally available for the advantageous liquidation of a block as large as 14,000 shares of such stock were (a) by sale through brokers on the Montreal Stock Exchange, (b) by sale in bulk to dealers (individually or in syndicate) for distribution at a price three points under the quoted market and (c) by a so-called "best efforts" agreement whereby a dealer would take an option for the block to be exercised, as purchasers for smaller lots might be found, at prices two points below the closing sales price on the Montreal Exchange for the preceding day.

13. For a skilled broker or dealer to liquidate such a block to advantage without seriously depressing prices would have required activities over a period of about three months, whichever procedure of those just above described should be used.

14. The price range per share on the Montreal Exchange during the three-month period following November 11, 1936, was from $25 to $22. During this period, the general price trend was upward until December 16 and 17, 1936, when peak volumes of slightly over 1,000 shares were dealt in for two days successively, and thereafter downward. Thus the mean price of actual sales in this period was $23.50 per share.

15. If during the three-month period following November 11, 1936, 14,000 additional shares had been offered by brokers on the Montreal Exchange, the average price obtained would have been about $17.25.

16. If beginning on November 11, 1936 an effort had been made to liquidate the block through a "best efforts" agreement as described in Paragraph 12 above, the block could probably have been liquidated within the following three months on terms which would have netted the owner an average price of $21.50 per share,—a result somewhat more favorable to the owner than probably could have been obtained through a dealer distribution described in Paragraph 12, above.

17. The fair market value as of November 11, 1936, of said stock was $21.50 per share and the amount of the overvaluation upon which the tax was paid was $26,050.

the date of the gift is controlling as to the value of the gift.

Section 506 of the Revenue Act of 1932, c. 209, 47 Stat. 169, 26 U.S.C.A. Int.Rev. Code, § 1005, which dealt with gifts in property and was in force in November 1936, provided that: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

There was a relevant Treasury Regulation—Regulation 79, Article 19 (1936 Ed.), dealing with valuations for gift tax purposes as follows:

"Art. 19. *Valuation of property.*—(1) General—The statute provides that if the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The value of a particular kind of property is not to be determined by a forced sale price or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time. Such value is to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the time of the gift should be considered. Depreciation or appreciation in value subsequent to the time of the gift are not relevant factors and will not be considered. * * *"

"(3) *Stocks and bonds.*—The value at the date of the gift in the case of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on such date.

"The value of stocks and bonds listed upon a stock exchange shall be obtained by taking the mean between the highest and lowest quoted selling prices upon the date of the gift. If the gift was made on Sunday or on a legal holiday, the transactions of the next previous business day will govern. If there were no sales on the date of the gift, the value shall be determined by taking the mean between the highest and lowest sales upon the nearest date either before or after the date of the gift, if within a reasonable period thereof.

\* \* \* \* \*

"If the value of a security cannot be determined by sales, or from bid and asked prices, as prescribed in the preceding provisions of this subdivision, then, in the case of corporate or other bonds, the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. Complete financial and other data upon which the donor bases his valuation should be submitted with the return.

"In exceptional cases in which it is established by clear and convincing evidence that the value per bond or share of any security determined upon the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, other relevant facts and elements of value will be considered in determining the fair market value. The size of the gift of any security is not a relevant factor and will not be considered in such determination."

■ It is common knowledge that sales of small lots of stock on an exchange afford no reliable criterion of value per share for large lots which if disposed of rapidly are likely to flood the market and thus depress the price. Every skillful broker who wishes to dispose of a block of stock larger than the market is likely to absorb without sacrifice in price will liquidate slowly by sales of small units. If he disposes of the stock too slowly, he runs the risk that a recession in current prices may occur and that the prices of his sales may suffer on that account. If he sells too quickly, he is likely to suffer from forcing an amount of stock on the market which exceeds the normal demand, so that purchasers will only buy at less than going rates. That "the size of the gift of any security is not a relevant factor" for consideration in determining market value, as the Regulations in force in 1936 prescribed, is quite contrary to experience. If the block is large enough and the market thin, size under ordinary circumstances will certainly count. To be sure some unusual factor like a struggle for corporate control might cause a large block to sell at a higher rate than would a small lot had no such struggle begun, but the size of the block to be offered is surely a matter for consideration in finding value.

The provision of the 1936 Regulations that declared "size * * * not a relevant factor" was rejected by the Fourth Circuit in Helvering v. Kimberly, 97 F.2d 433, and by the Seventh Circuit in Commissioner of Internal Revenue v. Shattuck, 97 F.2d 790. In Helvering v. Maytag, 125 F.2d 55, certiorari denied 316 U.S. 689, 62 S.Ct. 1280, 86 L.Ed. 1760, there was an excellent discussion by the Eighth Circuit in an opinion by Judge Woodrough in which the same position was taken. See also Bull v. Smith, 2 Cir., 119 F.2d 490.

 The attempt in the Regulations to outlaw size as a factor bearing on Stock Exchange prices having failed in several Circuit Courts of Appeal, in 1939, the Treasury deleted from its Regulations the words "or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time" and the words: "The size of the gift of any security is not a relevant factor and will not be considered in such determination." But the Commissioner in spite of this apparent abandonment of the former position again returns to the charge and makes much the same old contention that the size of a block of stock should have no relevancy in estimating its market value. Not only have many opinions of other courts rejected this claim that the size of a block of stock is not a factor to be considered in estimating value but in Bull v. Smith, 2 Cir., 119 F.2d 490, we held that the value of very large holdings should be determined by the amount the owner could realize through an efficient liquidation at the date when the value was to be ascertained or within a reasonable time thereafter and upheld a decision by the District Court in which various factors which might modify stock exchange prices were considered in testing whether those prices fairly reflected the real value. In the case at bar there was evidence that 14,000 shares of Electrolux was an amount far in excess of what was traded in during any month from November 1936 to March 1937 and there was expert opinion as to how far that addition to the probable supply would depress the market if it was prudently liquidated within several months following the date of the gift. Instead of taking the figure of $17.25 which, as the experts said, and the court found, would be realizable through sales within a few months following November 11, 1936, Judge Hincks adopted as a criterion the mean price of actual sales on the Montreal Exchange during a three month period following November 11, 1936, found to be $23.50 per share, less a charge of $2 per share which was the fee Horner had received for selling a block of 20,000 shares of Electrolux stock in 1938 under a "best efforts" arrangement whereby the dealer was exercising an option to take the stock at current Montreal Exchange prices. We cannot say that the Judge did not employ a tenable theory of valuation when he found that the 14,000 shares might have been sold under a "best efforts" arrangement within three months of November 11 at the mean prices current during that period on paying a dealer $2 per share as a commission.

The court below had before it a statement of consolidated net earnings of Electrolux and its affiliates and its earnings per share during the years 1931 and 1938, likewise of its dividend payments from 1932 to 1938, inclusive, and its balance sheet for those years. We have no reason to suppose that the court gave these statements no consideration merely because another basis for valuation was adopted founded upon prices on the Montreal Exchange with some modifications. Inasmuch as actual bona fide bid and asked prices were available, they, under the regulations, should be taken unless they did not reflect the fair market value and, in that event, some reasonable modification or other relevant facts and elements of value should be considered in determining fair market value.

The question raised by the taxpayer's appeal is whether the value per share of the Electrolux stock should not have been fixed at $17.25 rather than at a net of $21.50 under a supposititious "best efforts" arrangement. But, as the court said: "the plaintiff * * * is not entitled to a recovery based upon a valuation of $17.25 unless he proves that the block of Electrolux stock could not have been liquidated to better advantage by some other method which one skilled in such transactions might reasonably have selected."

Estimates of value such as we have discussed are difficult to justify in detail for they involve factors the weight of which is uncertain, but they are more reliable than appraisals made in disregard of the *amount* of stock to be valued. Even though a value arrived at in part upon a theoretical hypothesis may lack certainty we know that

a failure to consider the amount of stock to be valued and an automatic adoption of prices obtained on small current sales is bound to be wrong. The District Judge gave a most painstaking consideration to the situation as a whole and supported his opinion by careful reasoning. We certainly cannot say that his findings or conclusions were clearly erroneous.

Judgment affirmed.