## In re NEW YORK, N. H. & H. R. CO.
### No. 16562.

District Court, D. Connecticut.
Dec. 14, 1945.

---

[1] No opinion for publication.

H. J. Wells, Gen. Counsel, of New Haven, Conn. (J. H. Gardner, Jr., of New Haven, Conn., of counsel), for Trustees of Debtor.

Peabody, Brown, Rowley & Storey and Peabody, Arnold, Batchelder & Luther, all of Boston, Mass. (Howard W. Brown and Willard B. Luther, both of Boston, Mass., of counsel), for Merchants Nat. Bank of Boston.

Appleton, Rice & Perrin, of New York City (Clifton S. Thomson, of New York City, of counsel), for Bank of Manhattan Co.

Tillinghast, Collins & Tanner, of Providence, R. I. (Harold E. Staples, of Providence, R. I., of counsel), for Rhode Island Hospital Nat. Bank.

HINCKS, District Judge.

These three banks were collateral noteholders when bankruptcy intervened. As secured creditors their appropriate treatment was originally considered by the Interstate Commerce Commission as an integral part of a plan proposed for the reorganization of the principal debtor. After successive modifications of a plan had come before this court I entered an order (Order No. 734, P. R. 11050), approving the plan contained in the Fifth Supplemental Order of the Interstate Commerce Commission, thus giving effect to the essential rulings as to the rights of these banks contained in my opinion of December 8, 1941. 54 F.Supp. 595, 609. Under this order, these claimants were recognized as secured only to the extent of the value of their collateral as determined in the subsequent stages of these proceedings. Fifth Supplemental Order, I.C.C., Sections J(14) (15) and (16) P. R. (10901).

However, on appeal the appellate court held that these pledgee-creditors were entitled to compensation for their loss resulting from an ex parte injunction entered at the inception of the proceedings (October 23, 1935) restraining them in common with all other collateral noteholders from disposing of their collateral pending further order of court: that the damage "resulting from" the injunction and "caused the banks should be made good to them and that they should be classified as secured creditors to the extent to which they *could have realized* on their collateral had they not been restrained from selling, and as unsecured creditors only for the amount by which the debts owing them exceed such realizable value of the collateral." 2 Cir., 147 F.2d 40, 48.[1]

Consequently, so much of my decree as dealt with these creditors was reversed, and on motion of the debtor's trustees the appellate court directed this court "to entertain claims in administration by said banks for damages resulting from the injunction and to allow said claims and provide for their payment in cash." Id., 147 F.2d 53. Agreeable to this direction the

---

[1] On analysis of this holding, it is plain that it was not based on quasi-contract: the recoverable damages were not limited to proofs of the value of benefits to the estate. More plausible is the theory that the injunctive restraint on the contractual right of the pledgee to sell at will on default should be viewed as a rejection or breach by the estate in administration (the injunction having entered before trustees had been appointed) of an executory contract by the debtor. But for such a breach under Section 77, as indeed generally under the Bankruptcy Act, 11 U.S.C.A. § 205 and 1 et seq., the allowable damages constitute only a common claim. The

490

claims have been filed and the parties have been duly heard thereon.

In this situation the parties are in dispute as to the scope of the remand. The banks take the position that the appellate action was such as completely to dispose of the issue of liability; that this court is confined to an ascertainment of damages. The trustees, on the other hand, take the position that for present purposes the appellate action should be taken as an order of reversal with a direction for a new trial de novo with the issue of liability as well as the issue of damages still open. Feeling that the question thus raised was not free from doubt it seemed to me better to treat the petitions as submitted for trial de novo in the light of the appellate opinion and to admit any evidence desired by any party on both issues, so that if appeal results the appellate court may have before it a comprehensive record upon which it can indicate a final adjudication of the controversy.

■ Counsel for the trustees contends that the claimants by failure to appeal from the order of the injunction which had been entered by the court, even before trustees had been appointed, ex parte and "pending further order of court", and by their failure to make seasonable motion for a lifting of the injunction or otherwise to make demand for a restoration of their contractual rights, were so guilty of laches or so bound by their apparent acquiescence in the resulting restriction upon their rights, that they are barred from all claim for damage. As my earlier opinion shows, I thought this contention had merit. But the appellate court ruled otherwise and I, at least, must take the appellate ruling as stating the law of the case.[2]

■ Counsel for the trustees also contends that under the appellate opinion the claimants, to recover, must prove that the injunction was the proximate cause of their losses and that, without proofs that they would have sold their collateral if they had been free to do so, it cannot be said that that injunction was the proximate cause of their losses.

However, it is clear that the injunction was the proximate cause of the loss to the

opinion contains nothing to suggest that the allowance of full damages in cash or the equivalent against the estate in administration is predicated upon some concept that a contract with a pledgee has some inherent quality which justifies more generous compensation than is afforded to other executory promisees for a breach of the contractual relationship. Consequently, the only tenable conclusion is that appellate holding is based on the law not of contracts, but of torts.

[2] The only action taken by any of these claimants to be relieved of the injunction was by Merchants (a pledgee holding Boston & Providence stock as collateral) which on May 12, 1938, after Old Colony trustees had recommended a rejection of the Boston & Providence lease and after the market value of Boston & Providence stock had already declined by upwards of $30. per share, filed a petition to be relieved of the injunction. After a denial of this petition (July 19, 1938, P.R. 4615) a subsequent petition was filed, a denial of which was reversed on appeal, 2 Cir., April 3, 1939, 102 F.2d 923.

Merchants justifies the absence of earlier effort to be relieved of the injunction by pointing to the fact that prior to the impending rejection of the Boston & Providence lease the value of its collateral was ample for the payment of its note in full. The only direct evidence to explain the inactivity of the other claimants lies in testimony that an executive of Manhattan was told by his lawyer that by the injunc-

tion "Judge Hincks meant what he said, and subsequently it was proved by his answer to the Merchants Bank."

But prior to 1938 these claimants had had no official intimation as to what disposition the Appellate Court would make of an appeal from the order of injunction or of how this court would deal with a motion to dissolve. And I should suppose that since the claimant's rights are to be determined on the basis of the appellate opinion of 1945 their correlative obligation (if any) to mitigate their damage and the legal effect of their apparent acquiescence in the continuance of the injunction should be judged in the light of the applicability of the same doctrine.

Moreover, if, as they now contend, these claimants intended throughout to claim, and did claim, a valuation for their collateral as of the date of petition filed on the theory that that was the controlling date irrespective of the pendency of any injunction (a doctrine not adopted by the Appellate Court) their underlying mental attitude thus disclosed seems to add strength to the contention that by their acquiescence they waived claim for the tort accomplished by the injunction. For if their claim of law as to the controlling valuation date had been correct, they would not have been damaged by the injunction and presumably would have waived the technical tort to their jus desponendi just as Hospital waived with respect to the bonds in its pledge—as appears later in this opinion.

pledgees of their jus disponendi. And I construe the appellate opinion to mean that for such a loss they are entitled to compensation measured by what they could have realized, without proof that they would have elected to liquidate if they had been free to do so. Any intimations to the contrary, in Osage Oil Co. v. Chandler, 2 Cir., 287 F. 848, are I think overruled by the appellate decision here.

In cases of conversion generally the measure of damage is the value of the property converted: to recover that value the owner is not required to show what dispositions he would have made had the conversion not occurred. 65 C.J. 131. And if the wrongful detention of a chattel causes the owner to lose a ready market, the damage is recoverable. A.L.I. Restatement, Torts, Vol. 4, Pg. 674, without necessity for proof, I think, that the owner would have availed himself of that market but for the wrongful detention which prevented him. Even if the injunction here did not accomplish a conversion, the situation produced was at least strongly analogous.

The underlying principle, I apprehend, is founded upon the recognition of the fact that one having unqualified title to property, and indeed one having a qualified title with power of sale, has unfettered choice as to whether he will hold and enjoy the property or by sale obtain its equivalent in cash. When deprived of that right by a wrongful act, compensation dependent upon a perilous opportunity to show that he would have sold of his own volition is something less than full compensation.

Thus it is that in conversion cases involving property of fluctuating value the damages recoverable are the market value at the time of the conversion or the highest intermediate value between the notice of the conversion to the party injured and a reasonable time thereafter, whichever is higher. In re Salmon Weed & Co., 2 Cir., 53 F.2d 335, 79 A.L.R. 379. For an injured party to exact this higher measure of compensation it is not necessary for him to show that he had planned or intended to hold the property. Indeed, often—perhaps generally—the intervention of a wrongful act is not foreseen and the victim has in readiness no conscious policy for his guidance through an unexpected situation. Notwithstanding, he is entitled to be restored to a position in which his range of elective action is as broad as under his original right.

And so I conclude that it was not through inadvertence that the appellate court, having ruled that the injunction was a wrongful infringement of the rights of the pledgees, said that they were entitled to what they "could" have realized: That whether they would have sold if free to do so was immaterial.

Before attempting further to apply the appellate opinion to the facts of this case, attention should be called to the fact that the note of each of these claimants contained an acceleration clause as a result of which each such note must be deemed to have come into default on October 23, 1935, when the petition for reorganization was filed. On that day also the injunction entered. And since notice thereof must have reached the banks within a day or two thereafter the questions for ascertainment are the highest intermediate values which the banks could have realized from their collateral within a reasonable time thereafter.

As to Merchants, I find that within the critical period it could have realized more than enough to pay its note in full. I therefore hold it entitled, upon a surrender of its collateral which under the proofs it still holds, to payment in cash of all unpaid principal on its note with interest at 6%.

As to the Old Colony stock held both by Manhattan and by Hospital. 250,776 shares of the stock were outstanding, of which slightly more than 50% were owned by the New Haven. Of this holding the New Haven had pledged 122,568 shares with its collateral noteholders (as shown in trustees' Ex. 15) including these two banks, 15,200 shares with Manhattan and 6,950 shares with Hospital. 125,000 shares were in the hands of the public other than the New Haven and its pledgees. Prior to 1935 the stock was classified as an investment security largely on the strength of the New Haven guarantee. Since Old Colony lines under a long-term lease had been operated as an integral part of the New Haven system with no separate account of Old Colony earnings, until after petition filed no information as to Old Colony earnings had been available. In the fore part of 1935, as the New Haven credit became strained the price of the stock declined and it passed into the speculative class. In January, 1936, the New Haven trustees, still in doubt as to whether the lease should be rejected or preserved, applied to the court for au-

thority to advance the funds to pay the usual quarterly dividend of $1.75 on the Old Colony stock. With the authority of the court that dividend was paid. In May, 1936, the New Haven trustees rejected the Old Colony lease as burdensome whereupon Old Colony filed a petition for reorganization in this court and became a secondary debtor in these proceedings.

On the basis of published prices for sales of small lots the market value of Old Colony stock at petition filed (October 23, 1935) was $48. In early July, 1935, it had been as high as 68, and with the approaching bankruptcy of the New Haven had gradually shrunk to the figure mentioned. In November and December, 1935, the price trend on the same basis was generally downward reaching a low of 40 at the end of December. But on January 2, 1936, the price jumped to 50 and thereafter gradually rose to 70 in mid-March when a recession set in and by April the price was down again to 48 and by the end of May it was down to 30 and continued thereafter to recede for a long period. In December, 1944 it was quoted as low as 12 cents per share but following the publication of the appellate opinion the quoted price rose and had reached a high of $5.00 per share by the date of the hearing hereon.

In the period from October, 1935, to June, 1936, the average volume of sales on the Boston Stock Exchange where the stock was listed was about 1,300 shares monthly, and about 2,000 shares monthly in the over-the-counter market.

Counsel for both these banks agree that the blockage factor, invoked so frequently in tax cases, Bull v. Smith, 2 Cir., 119 F.2d 490, and Groff v. Mumford, 2 Cir., 150 F.2d 825, is equally applicable to the situation here. I so hold. Taking this factor into account, three witnesses called by the banks testified that a period of one to four months would have been required for an efficient liquidation of a block of 22,150 shares (15,200 pledged with Manhattan and 6,950 with Hospital). These witnesses testified respectively that in their opinion such a block within that period could have been liquidated to realize an average price per share as follows: $43, $50, and $52.

A witness called by the trustees testified that on the same basis such a block could not have been liquidated to realize over $40 per share.

After weighing all the testimony I find that the period of four months following the entry of the injunction would have allowed reasonable time for the accomplishment of a liquidation of 22,150 shares and that $43 per share represents the highest average which could have been realized from the liquidation of such a block in that period.

The foregoing finding, however, is based upon the hypothetical liquidation of 22,150 shares held by these two banks upon a market from which the 100,418 shares pledged with other collateral noteholders of the New Haven were excluded by the injunction. The trustees contend that the realizable value of the collateral pledged with these claimants should be determined upon the basis of what the market would have been if all the collateral noteholders had been left free to sell. On this basis, they urge, the pertinent block would comprise 122,568 shares, that being the total number of shares in pledge under the injunction, rather than only 22,150 shares, the amount held by these two banks.

The banks offered no testimony as to values predicated upon the market as expanded by the larger block. A witness called by the trustees testified that in his opinion the larger block could not have been liquidated to realize over "$25. or $30. a share." Taking into account all the evidence, I find that if all the debtor's pledgees had been left free to sell, the claimant banks could have realized only $30 per share on their Old Colony stock.

The argument in support of the larger block as the applicable factor, though plausible, should I think be rejected.[3] The problem here is as to the measure of damage resulting from the infringement of the claimants' rights. The appellate court has taken as that measure the existing market. And there is nothing in the proofs to justify the substitution of any other measure.

As to the New York, Ontario and Western Railway common stock pledged with Manhattan. On October 23, 1935, the New Haven owned a bare majority of this stock, and its entire holding was pledged 26,667 shares to Manhattan, 75,000 shares to Railroad Credit Corporation and 189,933 shares

---

[3] The contention assumes that if the court had then been correctly advised as to the applicable law as now announced in the appellate decision, there would have been no injunction. But as to this, there are no proofs. And, frankly, I hardly know myself what I would have done even if correctly advised as to the law. At that

to Reconstruction Finance Corporation. Unlike the Old Colony, the Ontario was never operated as a part of the New Haven system. Early in 1937 it filed a petition for reorganization under Section 77 in the District Court for the Southern District of New York and is still in the process of reorganization.

On October 23, 1935 Ontario common stock was listed on the New York Stock Exchange where its closing price for the day was 3⅞. In the period from October 23, 1935, to May 1, 1936 about 90,000 shares were traded in at prices ranging from 3⅝ to 7½. During this period, the peak prices were in February: by May first, the price had receded to 4¼. Throughout this period the stock was generally regarded as speculative: no dividend had been paid thereon for a long time prior thereto.

An expert witness called by Manhattan testified that on the assumption that the stock pledged with RFC and RCC had been withheld from the market, $4 per share could have been realized for the block of shares held by Manhattan within 1½ months to 4 months. He declined to offer an opinion as to what could have been realized for the Manhattan block if the stock held by the other two pledgees had also been on the market. As to this, his only testimony was that the presence of the larger blocks on the market would have "kept a pressure on the stock and it would have frightened speculators away."

The expert witness called by the trustees testified that on the assumption that the larger blocks held by other pledgees would not have been available for sale Manhattan's block could have been liquidated to realize about $3 per share, but that if RFC and RCC had been free to sell their collateral the availability of the pledged stock for sale would have depressed the price to such an extent that only $1 per share could have been obtained for Manhattan's block.

I find that the period of four months following the injunction would have been a reasonable time to allow Manhattan for the liquidation of this stock also. On the basis of a market from which the 264,933 shares held by the other pledgees were excluded by the injunction, I find that the highest realization that it could have accomplished during the four month period would have averaged $4 per share. On the basis of a market not closed to the other pledgees I find that the highest realizable value would have been $1 per share.

For reasons already stated,[3] I hold that the smaller block represents the applicable factor and adopt a figure of $4 per share as the basis of my award.

As to the First and Refunding Bonds pledged with Rhode Island Hospital National Bank. On October 23, 1935, Hospital also held in pledge $200,000 face value of debtor's First and Refunding Bonds. These bonds, which were held in two pieces, were never listed on any exchange: they constituted an entire issue of 6% gold bonds maturing July 1, 1972. They were secured under the same mortgage as the debtor's 6% convertible debentures maturing in 1948. Under that same mortgage $138,819,250 in face value of bonds in several issues were outstanding in the hands of the public (exclusive of bonds in the hands of New Haven pledgees) all of which were listed on the New York Stock Exchange. Of these various issues the convertible 6's of 1948 most nearly resembled, and had a value substantially equivalent to, the 6's of 1972 held in pledge by this claimant.

On October 23, 1935, the closing price for the convertible 6's of 1948 on the New York Stock Exchange was 27 and for the succeeding month ranged between 25½ and 33½. Thereafter, after much fluctuation the price reached 58 in February 1937 and fell to 10½ in April, 1939. Not until March, 1941, did it again reach 27 and

time, theoretically at least, the data shown on Schedule A, hereto appended, was available to me and there was a complete lack of information as to Old Colony earnings and prospects. It is entirely possible that even at the hazard of subjecting the estate to the damages resulting from an injunction I would have restrained all pledgees holding Old Colony stock (and perhaps other pledgees as well) either from any liquidation at all or from the sale of the Old Colony items at least until further information had been made available. Faced with the hazard of loss to the estate if I enjoined and the hazard of loss resulting from the foreclosure of pledges if I failed to enjoin, without a breathing space within which to form an informed opinion quite possibly I should have deemed the former hazard preferable in that its effect upon the estate was less irrevocable and should have enforced the status quo under the power recognized in the Rock Island decision (Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. Ry. Co.) 294 U.S. 648, 55 S. Ct. 595, 79 L.Ed. 1110, even though conscious that in so doing I was subjecting the estate to liability for a tort.

494

thereafter it steadily gained until May, 1945, when it reached 73.

I find that a period of two months following the entry of the injunction would have allowed Hospital reasonable time to liquidate its bonds.

I find that but for the injunction the claimant within said two-month period could have liquidated this item of collateral to realize 30, and that its realizable value in May, 1945, at the time of the hearing herein, was 73.

 A dispute arises over the application of the appellate decision to the situation here disclosed—a situation in which after the injunction entered the pledged stock fell and the pledged bonds rose in value. The New Haven trustees contend that in fixing the award to which Hospital is entitled the gain in the value of the bonds should be offset against its loss from the shrunken value of the stock. Hospital claims that it is entitled to keep the bonds or at least to have credit for their appreciated value in addition to compensation for its loss on the stock.

It is true that only one act of the estate, now held by the appellate decision to have been a wrongful act, came into play. But this act had an impact upon rights which were independent and separable. For although the rights of Hospital were derived from a single contract, by the terms of that contract its rights as to one item of collateral were entirely independent of its rights as to the other item, except for factors not involved here. Consequently, for present purposes Hospital must be viewed as the victim of two torts, not one. If the present action sounded in contract, we should have quite a different situation.

Happily the interference with the rights of Hospital as to the pledged bonds involved no damage. At least by its petition herein, perhaps by its position taken at an earlier stage, Hospital has waived any claim for the injury to its rights as to the bonds. I know of no principle of law which precludes a waiver under such circumstances and hold that Hospital is entitled to retain its bonds. (See note 2.)

It may be noted that neither the appellate opinion nor my ruling on this point means that in every reorganization case in bankruptcy the rights of a pledgee will be allowed their full contractual breadth and that as long as the debt is unpaid the pledgee may delay the valuation of his security and make his final election with the aid of hindsight. Some restriction on the rights of secured creditors is unavoidable in bankruptcy. The Bankruptcy Act, implemented by judicial decisions, attempts to draw a line of demarkation between the rights which are not affected and those subject to defined restrictions,—a line which will define "a reasonable compromise between the basic principle of equity of distribution, on the one hand, and accord due respect for the necessities of legitimate credit transactions, on the other." Collier on Bankruptcy, 14th Ed., Vol. III, pg. 255. The essence of my error lay in locating these pledgees on one side of that line where concededly the other secured creditors belonged [4] when according to the appellate decision I should have placed the pledgees on the other side.

 The appellate decision in effect, I think, implies that Sec. 57, sub. h of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. h, is applicable to reorganization cases under Section 77, at least with respect to pledgees. Thus a pledgee has a right, if the right is recognized in the terms of his pledge, to convert his collateral into money and under Sec. 57, sub. h, claim a valuation based upon such a conversion.[5] But if he delays unduly in liquidating his collateral, the trustees in bankruptcy, notwithstanding the terms of pledge, may compel liquidation if good cause for such action shall be shown. In re Salmon Weed & Co., 2 Cir., 53 F.2d 335, 79 A.L.R. 379.

 In a liquidation case in bankruptcy, of course, and apparently in reorganization cases as well, a reasonable prospect of higher market values for the collateral will constitute no cause for trustees to compel liquidation: such intervention is indicated only when delay involves

---

[4] The final paragraph of Section 77, sub. e, provides, in part: "The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts." My earlier error can be traced, at least in part, to the belief that this provision applied to railroad property represented by pledged

securities as well as to the same property represented by the same securities in the hands of those having general title thereto. The injunction, it should be remembered, did not purport to enjoin the sale or other transfer of the claimants' notes: it was directed only to the sale of their collateral.

[5] That is not to say, however, that under Section 57 or under any other provi-

hazard of lower values effective to increase the deficiency claim against the estate which it is the primary duty of the trustees to conserve. Even under the appellate opinion, I should suppose that in reorganization cases the trustees, and perhaps those who are responsible for formulating a plan, may at an early stage in the proceedings require pledgees to elect whether they will rely upon a valuation based upon a conversion into money or upon a valuation generally of a much later date to be expressed in the provisions of a plan, at least in cases in which the pledgees hold system securities and it is necessary that their position be known before a specific plan can be fully formulated.[6]

■ Interest as Damages. The appellate opinion contemplates that the damage done the banks shall be made good to them. Obviously the payment *now* of what they could have realized *then* does not compensate them for the loss of the interim use of the monies they were entitled to realize. I hold that interest at 6% from the date of the injunction to the date of the entry of the order hereon is recoverable. The order to be entered hereon shall provide for payment of such interest in addition to the realizable value of the pledged stocks.

■■ Only one further contention remains for a ruling. The banks ask that I enjoin the New Haven trustees from appealing from the orders to be entered herein. Even if the request, first raised in argument and on brief, be treated as a prayer for equitable relief, it must be overruled and denied. Whether the trustees, by failure to apply for certiorari to review the appellate opinion are finally precluded from further contesting the doctrine announced in the appellate opinion is for the appellate courts, not for this court, to decide. And whether my rulings herein conform, as I believe, to the language and intendment of the appellate decision are questions which the trustees just as much as the claimant banks are entitled to challenge by appeal.

The difficulties of the problems posed are such that certainly I cannot say that those who chance not to agree with my considered views, whether they be petitioners or respondents or both, are actuated by bad faith.

Computation of Deficiencies. The deficiency of Manhattan for which it will stand as an unsecured creditor will be determined as though its collateral had been liquidated at the values found above and adopted as the basis of the award, as of the date of the injunction. The deficiency, of course, will not be subject to deduction on account of interest awarded by way of damages. Any question as to the applicability of income from collateral to interest on the debt accruing subsequent to petition filed will be settled in accordance with the principles laid down in Collier on Bankruptcy, Vol. III, Pg. 281. Interest paid in advance on the debt as of petition filed will of course be credited on the unpaid principal of the debt. And the order entered hereon will be accompanied by an order providing for the elimination of Section J(15) of the approved plan (P. R. 10902).

The provisions of the order fixing the deficiency of Hospital will not only reflect a credit to the estate for the set-off of funds on deposit at petition filed but also will reserve power to deduct from the deficiency as now stated the proceeds of the bonds under pledge to Hospital when liquidated pursuant to Section J(14) of the approved plan. (P. R. 10901.)

The order upon Merchants' petition will provide for payment conditioned upon the surrender of its collateral and will be accompanied by an order eliminating Section J(16) of the plan.

Such orders may be submitted by counsel for the trustees and will be settled on notice, unless notice shall be waived.

NOTE.—The above opinion was never translated into an appealable order due to the fact that after its entry the claims involved were settled by a compromise approved by the court.

---

sion of the Bankruptcy Act a pledgee has a right to have his collateral valued as of the date of petition filed. Cf. Collier on Bankruptcy, Vol. III, Pg. 279, et seq.; In re Salmon Weed & Co., supra. Under the appellate decision, the date of October, 1935, is controlling because that was the date of the injunction—not because it was the date of petition filed.

6 However, in the situation here where

the trustees were vested with power to reject the Old Colony lease, their insistence prior to a rejection of the lease upon the liquidation of Old Colony stock would doubtless have been taken by the market to foreshadow a rejection and thus depress the value of the stock to the damage not only of the estate but also of a pledgee entitled to a valuation as of the date when he converts into money.

Schedule "A"

## The New York, New Haven and Hartford Railroad Company
### Statement of Collateral—October 23, 1935 Prices

| | Int. Rate | Amount of Loan | Date Due | Par Value Pledged | Security Pledged | Price *10-23-35 (or last) | Market Value | % Coverage |
|---|---|---|---|---|---|---|---|---|
| Chase National, New York | 4½% | $ 4,750,000 | 1- 2-36 | $ 8,200,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | $ 2,214,000 | |
| | | | | 1,660,000 | Old Colony R.R. Capital Stock | 48 | 796,800 | |
| | | | | | | | 3,010,800 | 63.4 |
| Irving Trust Co., New York | 4½% | 2,350,000 | 10-25-35 | 4,550,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 1,228,500 | |
| | | | | 428,000 | Old Colony R.R. Capital Stock | 48 | 205,440 | |
| | | | | | | | 1,433,940 | 61.0 |
| Bank of Manhattan, New York | 4½% | 1,000,000 | 12- 2-35 | 1,520,000 | Old Colony R.R. Capital Stock | 48 | 729,600 | |
| | | | | 2,666,700 | N.Y.,O.&W.Ry. Common Stock | 3⅞ | 103,335 | |
| | | | | | | | 832,935 | 83.2 |
| First National, Boston | 4½% | 4,000,000 | 1- 2-36 | 7,700,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 2,079,000 | |
| | | 200,000 | 10-29-35 | 490,500 | Prov., Warren & Bristol R.R. Stock | 25 (Est.) | 122,500 | |
| | | | | 2,352,000 | Rutland R.R. Preferred Stock | 3⅜ | 79,380 | |
| | | | | 635,000 | Old Colony R.R. Capital Stock | 48 | 319,200 | |
| | | | | | | | 2,600,080 | 61.9 |
| National Shawmut, Boston | 4½% | 2,000,000 | 10-29-35 | 3,275,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 884,250 | |
| | | | | 825,000 | Old Colony R.R. Capital Stock | 48 | 396,000 | |
| | | | | | | | 1,280,250 | 64.0 |
| Second National, Boston | 4½% | 500,000 | 1- 2-36 | 975,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 263,250 | |
| | | | | 85,000 | Old Colony R.R. Capital Stock | 48 | 40,800 | |
| | | | | | | | 304,050 | 60.8 |
| Merchants Natl., Boston | 4½% | 500,000 | 1- 2-36 | 524,600 | Bost. & Prov. R.R. Corp. Common Stock | 135 (Bid) | 708,210 | 141.6 |
| State St. Trust, Boston | 4½% | 175,000 | 1- 8-36 | 540,000 | NYNH&H 3½% Debentures—1956 | 24½ | 132,300 | |
| | | | | 25,000 | Old Colony R.R. Capital Stock | 48 | 12,000 | |
| | | | | | | | 144,300 | 82.5 |
| National Rockland, Boston | 4½% | 100,000 | 4- 2-36 | 100,000 | Old Colony R.R. Capital Stock | 48 | 48,000 | |
| | | | | 43,000 | Central New England 4% Mtge. Bds. 1961 | 43⅜ | 18,651 | |
| | | | | 57,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 15,390 | |
| | | | | | | | 82,041 | 82.0 |
| R. I. Hospital, Providence | 4½% | 500,000 | 1- 8-36 | 200,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 54,000 | |
| | | | | 695,000 | Old Colony R.R. Capital Stock | 48 | 333,600 | |
| | | | | | | | 387,600 | 77.5 |
| Union Trust, Springfield | 4½% | 200,000 | 1- 8-36 | 400,000 | NYNH&H 1st & Refdg. 6% Mtge. Bds. 1972 | 27 | 108,000 | |
| | | | | 26,500 | Old Colony R.R. Capital Stock | 48 | 12,720 | |
| | | | | | | | 120,720 | 60.3 |
| | | $16,275,000 | | $ 38,002,800 | Total Collateral with Banks | | $10,904,926 | 67.0 |

| | Int. Rate | Amount of Loan | Date Due | Par Value Pledged | Security Pledged | Price *10-23-35 (or last) | Market Value | % Coverage |
|---|---|---|---|---|---|---|---|---|
| **Railroad Credit Corp.** | 1½ | 1,428,226 | 12-25-35 | 312,600 | NYNH&H 3½% Conv. Debns.—1956 | 24½ | 76,587 | |
| | 1¼ | 1,000,000 | 4-24-37 | 1,750,000 | Old Colony R.R. Capital Stock | 48 | 840,000 | |
| | 1½ | 1,000,000 | 5-22-37 | 7,500,000 | NYO&w Ry. Common Stock | 3⅞ | 290,625 | |
| | | | | 570,000 | " Demand Notes—5% | (Est.) 100 | 570,000 | |
| | | | | 955,110 | Prov. & Worc. R.R. Common Stock | 73 | 697,223 | |
| | | | | 150,700 | Fruit Growers Express Common Stock | (Est.) 75 | 113,025 | |
| | | 3,428,226 | | 1,490,784 | This Company's distributive share in fund established under the Railroad Credit Marshalling and Distributive Plan 1931 at 80% of total, less credits received | | | |
| | | | | 3,000,000 | Conn. Co. 4% Debentures 1945 | | 670,853 | |
| | | | | 175,000 | Worc. & Conn. East. 1st Mtge. Bds. 1943 | (Bid.) 53 | 92,750 | |
| | | | | 107,100 | Norwich & Worc. R.R. Preferred Stock | 72 | 77,112 | |
| | | | | 315,000 | Hart. & Conn. West. R.R. Capital Stock | 13 | 40,950 | |
| | | | | 71,000 | Pemigewassett Valley R.R. Common Stock | 50 | 35,500 | |
| | | | | 16,397,284 | | | 3,504,625 | 99.8 (Without Conn. Co.) |
| **Recon. Finance Corp.** | 4 | 578,224 | 5-24-36 | 18,993,300 | NYO&W Ry. Common Stock | 3⅞ | 735,990 | |
| | 4 | 73,232 | 8-31-37 | 600,000 | " Notes | | | |
| | 4 | 48,322 | 10-16-37 | 2,200 | " Preferred Stock | | | |
| | 4 | 1,000,000 | 7-5-37 | 169,000 | NYNH&H 1st & Reftdg. 6% Mtge. Bds. 1972 | 27 | 42,930 | |
| | 4 | 2,000,000 | Demand | 24,300 | " 6% Secured Gold Bds. 1940 | 38 | 9,234 | |
| | 4 | 2,436,276 | " | 25,800 | " 6% Debentures 1948 | 27 | 6,966 | |
| | 4 | 1,500,000 | " | 819,732 | Hart. & Conn. Western R.R.—Notes | | | |
| | | | | 700,000 | " 6% 1st Mtge. Bds. 1933 | | | |
| | | | | 3,000 | " Common Stock | 13 | 390 | |
| | | 7,686,054 | | 4,277,300 | Old Colony R.R. Capital Stock | 48 | 2,053,104 | |
| | | | | 20,100 | Holyoke & Westfield R.R. Common Stock | 120 | 24,120 | |
| | | | | 11,300 | N.Y. City 3½% Corp. Common Stock 1948 | 99¾ | 11,215 | |
| | | | | 21,000 | Worc. & Conn. East. Ry. Mtge. Bds.—1943 | 53 | 11,130 | |
| | | | | 870,000 | C.N.E.Ry. 4% Mtge. Bonds—1961 | 43⅜ | 377,363 | |
| | | | | 146,400 | Conn. & Passumpsic Rivers Pref. Stock | 106 | 155,184 | |
| | | | | 35,400 | Massawippi Valley R.R. Common Stock | 65 | 23,010 | |
| | | | | 92,300 | Spring. Ry. Companies—5½% Pfd. Stock | 23 | 21,229 | |
| | | | | 5,398,100 | Berk. St. Ry. Co.—Common Stock | | | |
| | | | | 200,000 | " —5% Gold Debns. | | | |
| | | | | 3,333,000 | " —Notes | | | |

| Int. Rate | Amount of Loan | Date Due | Par Value Pledged | Security Pledged | Price *10-23-35 (or last) | Market Value | % Coverage |
|---|---|---|---|---|---|---|---|
| | | | 4,398,000 | Boston R.R. Hldg.—7% Demand Note | | | |
| | | | 1,500,000 | New England Transp. Co.—Capital Stock | | | |
| | | | 1,318,500 | " —Notes | | | |
| | | | 500,000 | N.Y. & Stamford—Capital Stock | | | |
| | | | 747,000 | " —1st Mtge. 4% Bonds | | | |
| | | | 1,374,684 | " —Notes | | | |
| | | | 1,500,000 | N.Y. Conn. R.R.—Capital Stock | | | |
| | | | 3,151,000 | N.Y., West. & Boston Ry. 4½% 1st Mtge. Bds. | | | |
| | | | 1,490,233 | Trustees Park Sq. Realty Trust—1st Mtge. | | | |
| | | | 385,000 | Prov. Prod. Warehouse Co.—Capital Stock | | | |
| | | | 352,397 | Prov., Warren & Bristol R.R.—6% Demand Notes | | | |
| | | | 338,487 | Railway Express Agency, Inc.—Advances | | | |
| | | | 200,000 | Boston Terminal Capital Stock | | | |
| | | | 7,903,047 | G.C.T. Outside Bldg.—Advances | | | |
| | | | | Also the following held as security for certain of the above items: | | | |
| | | | | $100,000 Hoosac Valley Bds. as security for Berkshire St. Ry. Co. note; | | | |
| | | | | $250,000 County Transp. Co. Capital Stock as security for N.Y. & Stamford notes; and | | | |
| | | | | $600,000 Penn Anthracite bonds as security for O. & W. notes | | | |
| | | | 60,890,630 | | | 3,471,865 | |
| Public Works Admin. | 4 | 4,800,000 | Serially from 1-1-37 to 1-1-44 | | | | |
| | | | 5,000,000 | Conn. Co. 6% Debns.—1944 | | — | |
| | | | 2,000,000 | Conn. Co. 4% Debns.—1945 | | — | |
| | | | 470,000 | Spfld.St.Ry.Refdg. & Genl.Mtge. Bds. 1940 | 25 | 117,500 | |
| | | | 353,000 | Berk.St.Ry.1st Mtge.Bds.—1937 | 25 | 88,250 | |
| | | | 1,638,400 | Hart. & Conn. West. Common Stock | 13 | 212,992 | |
| | | | (no par) | 4,375 shares Inter-Hydro Elec.Sys.Pfd. Stk. | 9¾ | 42,656 | |
| | | | 200,000 | Old Colony R.R. Capital Stock | 48 | 96,000 | |
| | | | 9,661,400 | | | 557,398 | |
| | $32,189,280 | | 124,952,114 | Total Collateral Deposited for Loans | | $18,438,814 | |

*Note: N.Y.,N.H. & H. 1st & Refdg. 6% Mtge. Bonds 1972 are an unlisted nominally outstanding issue. Price used represents New York Stock Exchange quoted price of a comparable issue, viz.: N.Y.,N.H. & H. 6% Conv. Debns. due Jan. 15, 1948.

New Haven Conn.,
November 15, 1945.