T.C. Memo. 1998-185


UNITED STATES TAX COURT


ESTATE OF ELDON L. AUKER, DECEASED, KIMBERLEE J. AUKER,
INDEPENDENT PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 13150-96.                    Filed May 19, 1998.


        E's estate includes real estate and interests in
   five family-owned entities, the assets of which include
   real estate and interests in two other family-owned
   entities that own real estate.  E's real estate
   consists of three apartment complexes.  Collectively,
   the entities' real estate consists of commercial rental
   property, residential rental property, vacant land, and
   developed property held for sale.  R and E agree that
   all the real estate mentioned above must be valued in
   order to determine the value of E's gross estate; and
   they agree on the value of each parcel of real estate,
   before any discount for market absorption; and they
   agree that large marketability and control discounts
   apply to most of the interests.  R and E dispute
   whether a market absorption discount inheres in the
   value of E's real estate and the entities' real estate.
        Held:  A 6.189-percent market absorption discount
   inheres in the value of each apartment complex; none of

the other real estate is valued by reference to a market absorption discount.

Russell E. Bowers and Bernard L. McAra, for petitioner.

Trevor T. Wetherington, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  The Estate of Eldon L. Auker, Deceased, Kimberlee J. Auker, Independent Personal Representative, petitioned the Court to redetermine respondent's determination of a $1,810,737 deficiency in Federal estate tax.  Following concessions by the parties, the only issue left to decide is whether a discount for market absorption inheres in the August 12, 1992, fair market value of certain assets included in the Estate of Eldon L. Auker (the estate).  The assets consist of three apartment complexes (collectively, the apartment complexes) and interests in five family-owned entities the assets of which include real estate and interests in two other family-owned entities that own real estate.

We hold that a 6.189-percent market absorption discount inheres in the fair market value of each apartment complex, and that the values of the decedent's interests in the entities are not determined by reference to a market absorption discount. Unless otherwise stated, section references are to the applicable provisions of the Internal Revenue Code.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference. When the subject petition was filed, the estate's legal address was in Grand Blanc, Michigan.[1] Grand Blanc and Flint, Michigan, are located in Genesee County. The center of Grand Blanc is approximately 7.5 miles south-southeast from the center of Flint.

The decedent developed and managed commercial and residential real estate in Genesee County until his death on August 12, 1992. His oldest child, Kimberlee J. Auker-Cooper (Ms. Auker-Cooper), is the personal representative of his estate. On November 9, 1993, Ms. Auker-Cooper timely filed the estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, with the Commissioner of Internal Revenue (the Commissioner). Less than 3 years later, the Commissioner issued Ms. Auker-Cooper, in her capacity as the estate's representative, a notice of deficiency listing a $1,810,737 deficiency in Federal estate tax.

During his lifetime, the decedent established a revocable trust (the Trust), named the "Eldon L. Auker Living Trust", by executing an instrument dated October 1, 1980, the provisions of

_____

[1] The record does not reveal the personal representative's residence at the time of the petition.

which were restated in an instrument he executed on May 22, 1992. On December 11, 1989, the decedent transferred to the Trust his title interest, as sole proprietor, in the apartment complexes which were named The Landings at Fountain Pointe (The Landings), Fox Hill Glens (Fox Hill), and Stonehenge Gates (Stonehenge). The Landings was built in the 1970's, and it is sited on 40.6 acres in Grand Blanc. The Landings consists of 37 buildings with a total of 468 living units (424 one- or two-bedroom apartments and 44 townhouses), a clubhouse, a swimming pool, and tennis courts. Grand Blanc is one of Genesee County's more affluent communities, and its population was growing on the applicable valuation date.

Fox Hill was built from 1985 through 1987, and it is sited on 31.18 acres in Grand Blanc. Fox Hill consists of 22 buildings with a total of 286 living units (264 one- or two-bedroom apartments and 22 townhouses), a clubhouse, a swimming pool, tennis courts, and a jogging trail. Fox Hill is located approximately 3.5 miles from The Landings.

Stonehenge was built in two phases; approximately two-thirds of the complex was built from 1979 through 1980, and the rest, which generally consists of five of the more luxurious apartment buildings in the complex, was built from November 1985 through January 1986. Stonehenge is sited on 19.09 acres in Flint, and it consists of 15 buildings, each with 12 living units (for a

total of 180 living units, all of which are one- or two-bedroom apartments), a clubhouse, a swimming pool, and tennis courts. Flint is the largest city in Genesee County, and it is the site of General Motors (GM) and other large employers.  The population and economy of Flint were growing on the applicable valuation date, and it had one of the strongest retail markets in Michigan.

Approximately 32 months after the decedent transferred the apartment complexes to the Trust, he transferred to the Trust his complete stock interests in family corporations named Auker Investments, Inc.; Grand Pointe, Inc.; K.A.A., Inc.; and The Aukers, Community Developers, Ltd.; and his complete ownership interest in a family general partnership named Eldon L. Auker Enterprises.  When the decedent died, the Trust owned equity interests in these entities as follows:  (1) A 100-percent interest in Auker Investments, Inc., (2) a 5-percent interest in Grand Pointe, Inc., (3) a 25-percent interest in K.A.A., Inc., (4) a 26-percent interest in The Aukers, Community Developers, Ltd., and (5) a 35.08-percent interest in Eldon L. Auker Enterprises.  Also at that time, Auker Investments, Inc., owned a 25.57-percent equity interest in Eldon L. Auker Enterprises; The Aukers, Community Developers, Ltd., owned a 20.27-percent equity interest in Eldon L. Auker Enterprises and a 20.74-percent equity interest in a family general partnership named Auker Enterprises; and Eldon L. Auker Enterprises and Auker Enterprises each owned a

50-percent equity interest in Auker Homes.[2]  See the appendix for a chart of the relationships between the various entities and the Trust.  The assets, liabilities, and net worth of these entities, at the values stipulated by the parties without regard to market absorption discounts, were as follows on the date of the decedent's death (the applicable valuation date):[3]

Auker Investments, Inc.

    Assets

        25.57% Interest in Eldon L. Auker Enterprises $512,000

|  |  |
|---|---|
| Total | 512,000 |

    Liabilities

|  |  |
|---|---|
| Total | -0- |

    Net Worth

|  |  |
|---|---|
| Total | 512,000 |

Grand Pointe, Inc.

    Assets

| | |
|---|---|
| Cash | $3,607 |
| Accounts and notes receivable | 41,137 |
| Receivables--other | 55,425 |
| Commercial rental property--Fenton Hill Shopping Center 1040 Hill Road, Grand Blanc | 525,000 |
| Land under development--held for sale | 2,660,000 |
| Equipment and/or vehicles | 773 |
| Total | 3,285,942 |

    Liabilities

|  |  |
|---|---|
| Total | 2,258,664 |

    Net Worth

|  |  |
|---|---|
| Total | 1,027,278 |

K.A.A., Inc.

---

[2] Each remaining equity interest in all of the entities mentioned above was owned by a member of the Auker family, either directly or indirectly.

[3] To the extent that a real estate interest listed below as an asset does not reference a street address, we are unable to determine the specifics of the parcel or parcels of real estate that relate to that interest.

Assets

| | |
|---|---|
| Cash | $6,650 |
| Construction in progress | 115,880 |
| Receivable--Eldon L. Auker Enterprises | 55,526 |
| Receivable--other | 10,950 |
| Accrued interest on receivables | 21,931 |
| 100% interest in vacant land | 17,400 |
| Equipment and/or vehicles | 12,504 |
| Total | 240,841 |

Liabilities

| | |
|---|---|
| Total | 226,511 |

Net Worth

| | |
|---|---|
| Total | 14,330 |

The Aukers, Community Developers, Ltd.

Assets

| | |
|---|---|
| Prepaid Taxes | $1,974 |
| 20.72% interest in Eldon L. Auker Enterprises | 415,000 |
| 20.74% interest in Auker Enterprises | 514,161 |
| Total | 931,135 |

Liabilities

| | |
|---|---|
| Total | -0- |

Net Worth

| | |
|---|---|
| Total | 931,135 |

Eldon L. Auker Enterprises

Assets

| | |
|---|---|
| Cash | $3,494 |
| Inventory-supplies | 2,024 |
| Accounts and notes receivable | 462,069 |
| Receivable--Auker Homes | 510,187 |
| Receivable--K.A.A. Enterprises | 306,800 |
| Accrued interest on receivables | 60,515 |
| Land contracts receivable | 22,567 |
| Commercial Rental Property--Burger King 11325 S. Saginaw Street, Grand Blanc | 303,500 |
| Commercial Rental Property--Gingerbread House 11319 S. Saginaw Street, Grand Blanc | 113,000 |
| 100% interest in residential rental properties | 191,800 |
| 50% interest in residential rental properties | 93,440 |
| 100% interest in vacant land | 55,000 |
| 50% interest in vacant land | 135,160 |
| 33.3% interest in vacant land | 41,166 |
| 50% interest in Auker Homes | 1,576,847 |
| Equipment and/or vehicles | 345 |
| Total | ¹3,878,544 |

Liabilities

Total                                    797,588

Net Worth
                Total                                    3,080,956


[1]We recognize that the total value of these assets is $3,877,914.  The parties have stipulated that the total value is $3,878,544, and they have not explained the difference between their stipulated value and the actual value.  We proceed using the stipulated value.

Auker Homes

Assets

Cash
$4,942
                Escrow account--sales in process
93,123
                Inventory-supplies
14,290
                Accounts and notes receivable
13,026
                Receivable--Kings Pointe Enterprises
960,124
                Receivable--Grand Pointe, Inc.
1,532,150
                Mortgage receivable--Kings Pointe Enterprises
500,000
                Accrued interest on receivables
228,758
                Land contracts receivable
353,906
                Commercial rental property--Victoria Square Shopping Mall
775,000
                                        4501 Hill Road, Grand Blanc
                Commercial rental property--Kingsley Square
600,000
                                        6070 Fenton Road, Flint
                Commercial rental property--Ponderosa
515,000
                                        1030 Hill Road, Grand Blanc
                Commercial rental property--Richfield Road Medical Center
140,000
                                        5529 Richfield Road, Flint
                Residential rental properties
263,930
                Sage Lake Property
475,000
                Developed residential lots held for sale
370,170
                Tri-Park development costs
145,240
                Land held for sale
283,200
                Equipment and/or vehicles
19,536
                    Total
[1]7,242,395

Liabilities
                Total
1,986,238

Net Worth
            Total
5,256,157

[1]We recognized that the total value of these assets is $7,287,395.  The parties have stipulated that the total value is $7,242,395, and they have not explained the difference between their stipulated value and the actual value.  We proceed using the stipulated value.


Auker Enterprises

    Assets

            Cash
$756,890
            Construction in progress
4,757
            Receivable--Auker Homes
145,220
            Accrued interest on receivables
24,499
            Land contracts receivable
78,800
            Commercial rental property--5124 Hill Road, Grand Blanc
145,000        Commercial rental property--6063 Fenton, Grand Blanc
310,000
            50% interest in commercial rental properties
82,400
            100% interest in residential rental properties
385,493
            50% interest in residential rental properties
11,040
            100% interest in vacant land
177,300
            50% interest in vacant land
135,160
            33.3% interest in vacant land
41,163
            50% interest in Auker Homes
1,576,847
            Equipment and/or vehicles
31,486
              Total
3,906,055

    Liabilities
            Total
92,085

    Net Worth
            Total
3,813,970

All of the real estate mentioned above (including the apartment complexes), which we collectively refer to as the subject property, is located in Genesee County, with the exception of

vacant land on Holly Road, Holly Township, Michigan, which is located in Oakland County, Michigan.

Following the decedent's death, the estate paid $39,450 to the real estate appraising and consulting firm of Allied Real Estate Appraisers, Inc., to ascertain the "current market value" on August 12, 1992, of each parcel of the subject property for Federal estate tax purposes. Wayne E. Knecht (Mr. Knecht), MAI,[4] and Lawrence F. Piper (Mr. Piper), SRA[5] (collectively referred to as the appraisers), two of the firm's certified real estate appraisers, inspected and valued most of the larger interests, taking into account the "highest and best use" of each parcel and assuming that each of the apartment complexes, the Burger King property located at 11325 S. Saginaw St., Grand Blanc, and the residential rental property at 6642 Kings Pointe, Grand Blanc, would be marketed for a period of 18 months, 1 year, and 3 to 6 months, respectively.[6] The appraisers arrived at their values by employing a sales comparison method, income capitalization

---

[4] The designation of MAI is awarded to qualifying members of the American Institute of Real Estate Appraisers, and it is the most highly recognized appraisal designation within the appraisal community. Mr. Knecht has held this designation for approximately 35 years.

[5] The designation of Senior Residential Appraiser is awarded to qualifying members of the Society of Real Estate Appraisers.

[6] In 1992, the average listing for residential property in Genesee County was 92 days, and the average listing for unsold properties of all types was 170 days.

method, and cost method.  The appraisers took into account

various data on Genesee County, including its location,

composition, demographics, population density, and accessibility.

The appraisers followed an industry definition of the term

"market value", under which the term meant:

> MARKET VALUE--The most probable price in terms of money
> which a property should bring in a competitive and open
> market under all conditions requisite to a fair sale,
> the buyer and seller, each acting prudently,
> knowledgeably and assuming the price is not affected by
> undue stimulus.
>
> Implicit in this definition is the consummation of a
> sale as of a specific date and the passing of title
> from seller to buyer under conditions whereby:
>
> 1)   buyer and seller are typically motivated.
>
> 2)   both parties are well informed or well advised,
>      and each acting in what they consider their own
>      best interest.
>
> 3)   a reasonable time if [sic] allowed for exposure in
>      the open market.
>
> 4)   payment is made in cash or its equivalent.
>
> 5)   financing, if any, is on terms generally available
>      in the community at the specified date and typical
>      for the property type in its locale.
>
> 6)   the price presents a normal consideration for the
>      property sold unaffected by special financing
>      amounts and/or terms, services, fees, costs, or
>      credits incurred in the transaction.*
>
> *REAL ESTATE APPRAISAL TERMINOLOGY, (REVISED EDITION),
> 1984, pages 160 & 161.

The appraisers explained in their appraisal reports that the

sales comparison method compares a property with similar

properties of the same type which sell close to the valuation date, and that adjustments are made to the sale price of each comparable property to ascertain the value of the property under consideration.  Comparable properties, the reports state, are properties which compare to the property under consideration as to time and condition of sale (with special emphasis on the condition of the market), location, physical characteristics, income characteristics, and terms of financing.

The reports also state that the income capitalization method ascertains from market transactions the ratio of selling price to net operating income at the time of sale in order to arrive at a capitalization rate, and that this capitalization rate is applied to similar property, on the basis of the similar property's net operating income, in order to value it.  As to the cost method, the reports state, this method ascertains value through the following three-step process:  (1) The estimated value of the land that is part of the property to be valued is ascertained using the sales comparison method, (2) the cost to reproduce the property under consideration is estimated at current costs, and (3) the estimated land value is added to the estimated cost of reproduction, less depreciation, to arrive at the value of the property under consideration.

In applying the sales comparison method to each of the apartment complexes, the appraisers could not find any sales in

Genesee County of property similar to the apartment complexes, which occurred near the applicable valuation date.[7]  Thus, the appraisers looked to sales of "large apartment complexes in different parts of the state" and ascertained and analyzed the five following sales:  (1) The $5,500,000 sale of a 280-unit complex in Kalamazoo, Michigan, in June 1990, to a Michigan limited partnership, (2) the $3,050,000 sale of a 142-unit complex in Ypsilanti, Michigan, in November 1991, to Geo Nyman, (3) the $1,506,000 sale of a 70-unit complex in Woodhaven, Michigan, in August 1992, to Kulish, (4) the $2,625,000 sale of an 81-unit complex in Springfield Township, Michigan, in September 1991, to Ron Iacobelli, and (5) the $2,590,000 sale of a 72-unit complex in Ann Arbor, Michigan, in December 1992, to Sandy Nam.  The appraisers concluded that the respective values under the sales comparison method for The Landings, Fox Hill, and Stonehenge were $8,300,000, $9,030,000, and $4,745,000.

In applying the cost method to each of the apartment complexes, the appraisers analyzed three sales of vacant land near the applicable valuation date and the cost to reproduce each of the apartment complexes.  The appraisers concluded that the respective values under the cost method for The Landings, Fox Hill, and Stonehenge were $8,956,000, $9,640,000, and $4,957,000.

---

[7] Very few apartment complexes in Genesee County actually compare to the apartment complexes in issue.

In applying the income capitalization method to each of the apartment complexes, the appraisers used the band of investment technique to ascertain a capitalization rate for each complex; the band of investment technique ascertains an overall rate of return by reference to a mortgage constant (or loan component) and an equity dividend rate (or equity component).  Each complex's total income, expenses, and net operating income for 1991 were:

|  | The Landings | Fox Hill | Stonehenge |
|---|---|---|---|
| Total income | $2,074,746 | $1,703,700 | $945,215 |
| Total expenses | 1,968,850 | 706,700 | 407,592 |
| Net operating income | 105,896 | 997,000 | 537,623 |

and the appraisers ascertained the following pro forma operating statements to factor into their analysis under the income capitalization method:

|  | The Landings | Fox Hill | Stonehenge |
|---|---|---|---|
| Gross possible rent | $2,826,720 | $1,860,780 | $1,014,060 |
| Less rebates | (448,560) | (52,380) | (37,020) |
| Gross rents after rebates | 2,378,160 | 1,808,400 | 977,040 |
| Laundry rental income | 39,000 | 10,400 | 7,600 |
| Carports rental income | 14,400 | 29,754 | 13,306 |
| Total income | 2,431,560 | 1,848,554 | 997,946 |
| Vacancy | (356,724) | (90,420) | (48,852) |
| Effective gross income | 2,074,836 | 1,758,134 | 949,094 |
| Less expenses | (996,100) | (590,700) | (351,000) |
| Net income | 1,078,736 | 1,167,434 | 598,094 |

On the basis of market data, the appraisers calculated an overall rate of return of 10.238 percent for The Landings.  The components of this rate were:  (1) A mortgage constant of 7.238 percent, which was based on an 8.5-percent loan with a 25-year

amortization, 5-year call, and 75-percent loan to value, and (2) an equity dividend rate of 3 percent, which was based on a 12-percent equity yield on 25 percent of value. The appraisers calculated an overall rate of return of 9.738 percent for Stonehenge and Fox Hill. The components of this rate were: (1) A mortgage constant of 7.238 percent, which was based on an 8.5-percent loan with a 25-year amortization, 5-year call, and 75-percent loan to value, and (2) an equity dividend rate of 2.5 percent, which was based on a 10-percent equity yield on 25 percent of value.[8] The appraisers ascertained the capitalization rate of each complex by adding the corresponding overall rate of return to a tax cap rate of 2.96 percent. The appraisers then ascertained each complex's market value under the income capitalization method by dividing its pro forma net income by its capitalization rate. The appraisers concluded that the respective values under the income capitalization method for The Landings, Fox Hill, and Stonehenge were $8,172,000, $9,190,000, and $4,710,000.

In connection with the income capitalization method, the appraisers also ascertained the capitalization rates of the following six properties: (1) The 280-unit complex in Kalamazoo, Michigan, that sold in June 1990, (2) the 70-unit complex in

---

[8] The appraisers applied an equity dividend rate to The Landings that was higher than for the other two complexes because The Landings had the highest vacancy rate.

Woodhaven, Michigan, that sold in August 1992, (3) the 81-unit complex in Springfield Township, Michigan, that sold in September 1991, (4) the 80-unit complex in Ann Arbor, Michigan, that sold in December 1992, (5) an apartment complex in Farmington, Michigan, that sold in May 1991, and (6) a 228-unit apartment in Meridian Township, Michigan, that sold in August 1990. The appraisers considered each property's gross income expectancy, expected reduction in gross income for less than full occupancy and collection losses, expected annual operating expenses, the pattern and duration of the property's income stream, and the anticipated value of the resale of other real property interest reversions. The appraisers took into account the relationship of supply and demand, information on trends and market anticipation, and the fact that two insurance companies were looking in August 1992 to make a low-interest loan on the purchase of income-producing property in or near Genesee County.

The appraisers concluded that the values derived under the income capitalization method were the best indicia of value for each of the apartment complexes, and that the market values of The Landings, Fox Hill, and Stonehenge were $8,172,000, $9,190,000, and $4,710,000, respectively.

The appraisers used one or more of the three valuation methods to ascertain the following market values of the other parcels of real estate which they had inspected. This real

estate, and the values ascertained by the appraisers, is set forth below by category:[9]

Commercial Rental Properties

| | |
|---|---:|
| G-5529 Richfield Rd., Flint (Richfield Rd. Medical Center) | $140,000 |
| 4501 Hill Rd., Grand Blanc (Victoria Square Shopping Mall) | 775,000 |
| 6070 Fenton Rd., Flint (Kingsley Square Shopping Center) | 600,000 |
| 1040 Hill Rd., Grand Blanc (Fenton Hill Center) | 525,000 |
| 1030 Hill Rd., Grand Blanc (Ponderosa) | 515,000 |
| 11325 S. Saginaw St., Grand Blanc (Burger King) | 303,500 |
| 11319 S. Saginaw St., Grand Blanc (Gingerbread House) | 113,000 |
| 5451 S. Saginaw St., Grand Blanc | 95,000 |
| 5459 S. Saginaw St., Grand Blanc | 111,000 |
| 5124 E. Hill Rd., Grand Blanc | 145,000 |
| 6063 Fenton Rd., Flint | 310,000 |
| | 3,632,500 |

Residential Rental Properties

| | |
|---|---:|
| 6642 Kings Pointe, Grand Blanc | $175,000 |
| 2381 E. Hill Rd., Grand Blanc | 154,000 |
| | 329,000 |

Vacant Land

| | |
|---|---:|
| S/E 1/4 of section 17, Porter Rd., Grand Blanc | $45,000 |
| Holly Rd., Holly Township | 190,000 |
| Section 11, Hill Rd.--West of NBD Bank, Grand Blanc | 45,000 |
| S/E corner of Reid Rd. & Dort Highway, Grand Blanc | 294,000 |
| Section 11, Hill Rd.--East of NBD Bank, Grand Blanc | 32,000 |
| Hill Rd., East of Jennings Rd. (Edson Farm), Mundy Township | 89,000 |
| Section 29, Baldwin Rd., Grand Blanc | 72,000 |
| North Side of Hill Road, East of Genesee Road, Grand Blanc | 160,000 |
| | 927,000 |

The attributes of these parcels are as follows:

Commercial Rental Properties

| | |
|---|---|
| Location: | G-5529 Richfield Rd., Flint |
| Site size: | 21,760 square feet |
| Zoning: | C-1 (Light commercial) |
| Occupancy: | Dental office referred to as Richfield Rd. Medical center |
| Improvements: | Dental office |
| Condition of improvements: | Good |
| Highest and best use: | Dental office |

---

[9] The parties have stipulated that these values are the values of some of the parcels of real estate owned by one or more of the entities, as set forth supra pp. 6-8.

Location:                    4501 Hill Rd., Grand Blanc
Site size:                   162,965 square feet
Zoning:                      B-1 (local business district--commercial)
Occupancy:                   Victoria Square Shopping Mall
Improvements:                One story masonry constructed strip shopping center with 8 tenants and containing a total of 22,535 square feet
Condition of improvements:   Average
Highest and best use:        As improved


Location:                    6070 Fenton Rd., Flint
Site size:                   73,870 square feet
Zoning:                      C-3 (regional retail district)
Occupancy:                   Kingsley Square Shopping Center
Improvements:                One story masonry constructed strip shopping mall containing 11,230 square feet, along with site improvements
Condition of improvements:   Good
Highest and best use:        As improved


Location:                    1040 Hill Rd., Grand Blanc
Site size:                   Approximately 1.3 acres
Zoning:                      B-2 (community business district)
Occupancy:                   Fenton Hill Center, a strip center
Improvements:                One story masonry constructed strip center mall containing total of 9,000 square feet, along with site improvements
Condition of improvements:   Good
Highest and best use:        As improved


Location:                    1040 Hill Rd., Grand Blanc
Site size:                   Approximately 1.45 acres
Zoning:                      B-2 (community business district)
Occupancy:                   Ponderosa Steak House
Improvements:                One story masonry constructed franchise-type restaurant containing 6,164 square feet, along with site improvements
Condition of improvements:   Average
Highest and best use:        As improved


Location:                    11325 S. Saginaw St., Grand Blanc
Site size:                   47,916 square feet
Zoning:                      B-3 (general business district--commercial)
Occupancy:                   Burger King
Improvements:                Fast food restaurant with 3,441 square feet
Condition of improvements:   Average
Highest and best use:        Fast food

Location:                      11319 S. Saginaw St., Grand Blanc
                               (Gingerbread House)
Site size:                     24,829 square feet, including 90 feet of
                               road frontage
Zoning:                        B-3 (general business district--
                               commercial)
Occupancy:                     Tenant--Chiropractor
Improvements:                  Asphalt parking lot and 2-story building
                               with 4,056 square feet
Condition of improvements:     Average to above average
Highest and best use:          Present use for medicine


Location:                      5451 S. Saginaw St., Grand Blanc
Site size:                     10.2 acres
Zoning:                        B-3 (general business district--
                               commercial)
Occupancy:                     Residence
Improvements:                  One story house of 1,232 square feet
Condition of improvements:     Illegal residence
Highest and best use:          Commercial use/development of vacant site


Location:                      5459 S. Saginaw St., Grand Blanc
Site size:                     1.4 acres, with 349 foot road frontage
Zoning:                        B-3 (general business district--
                               commercial)
Occupancy:                     Used car sales
Improvements:                  Commercial one-story building with 1,384
                               square feet
Condition of improvements:     Below average
Highest and best use:          Present use with potential for future
                               commercial development


Location:                      5124 E. Hill Rd., Grand Blanc
Site size:                     25,000 square feet
Zoning:                        RM-1 (multiple family residential
                               district)
Occupancy:                     Tenant occupied as Food Plus Party Store
Improvements:                  One story masonry constructed commercial
                               type building containing 2,400 square
                               feet, along with site improvements
Condition of improvements:     Average
Highest and best use:          As improved


Location:                      6063 Fenton Rd., Flint
Site size:                     31,680 square feet
Zoning:                        B-1 (local business district--commercial)
Occupancy:                     Tenant named Trialon Corp.
Improvements:                  One story office building with 5,712 quare
                               feet
Condition of improvements:     Good
Highest and best use:          As improved

Residential Rental Properties

|                            |                                                              |
|----------------------------|--------------------------------------------------------------|
| Location:                  | 6642 Kings Pointe, Grand Blanc                               |
| Site size:                 | 18,157 square feet                                           |
| Zoning:                    | Residential                                                 |
| Improvements:              | 5 bedroom, 2.5 bath two story house (19 years old), with 3,508 square feet of living area and attached garage |
| Highest and best use:      | Residential                                                 |

|                            |                                                              |
|----------------------------|--------------------------------------------------------------|
| Location:                  | 2381 E. Hill Rd., Grand Blanc                               |
| Site size:                 | 3 acres                                                     |
| Zoning:                    | B-1 (local business district-commercial)                   |
| Occupancy:                 | Residence                                                   |
| Improvements:              | Two story frame house with 1,728 square feet               |
| Condition of improvements: | Poor with no value                                         |
| Highest and best use:      | Commercial use/development of vacant site                  |

Vacant Land

|                            |                                                              |
|----------------------------|--------------------------------------------------------------|
| Location:                  | S/E 1/4 of section 17, Porter Rd., Grand Blanc             |
| Site size:                 | 30.51 acres plus two outlots of 60' x 95' and 60' x 190'   |
| Zoning:                    | R-2 (single family houses; farm animals allowed if site over 10 acres) |
| Occupancy:                 | Vacant land                                                 |
| Improvements:              | None                                                        |
| Highest and best use:      | Residential land                                           |

|                            |                                                              |
|----------------------------|--------------------------------------------------------------|
| Location:                  | Holly Rd., Holly Township                                  |
| Site size:                 | Approximately 176 acres                                    |
| Zoning:                    | AG/RE agricultural residential                            |
| Occupancy:                 | Vacant land                                                 |
| Improvements:              | None                                                        |
| Highest and best use:      | Residential land                                           |

|                            |                                                              |
|----------------------------|--------------------------------------------------------------|
| Location:                  | Section 11, Hill Rd.--west of NBD Bank, Grand Blanc        |
| Site size:                 | Approximately 6.48 acres                                   |
| Zoning:                    | west 180' of total parcel: RM-1 (multiple family residential district) Balance of the site: B-1 (local business district--commercial) |
| Occupancy:                 | Vacant land                                                 |
| Improvements:              | None                                                        |
| Highest and best use:      | Multi family                                               |

Location:                        S/E corner of Reid Rd. & Dort Highway, Grand Blanc
Site size:                       68.49 acres (gross)
Zoning:                          Light industrial and light industrial research park
Occupancy:                       Vacant land
Improvements:                    Single family house with 1,381 square feet
Condition of improvements:       Average or less
Highest and best use:            Industrial


Location:                        Section 11, Hill Rd.--east of NBD Bank, Grand Blanc
Site size:                       4.54 acres
Zoning:                          East 271' of total parcel:  RM-1 (multiple family residential district) Balance of the site:  B-1 (local business district--commercial)
Occupancy:                       Vacant land
Improvements:                    None
Highest and best use:            Multi family


Location:                        Hill Rd., East of Jennings Rd. (Edson Farm), Mundy Township
Site size:                       81.30 acres
Zoning:                          R/A--residential agricultural
Occupancy:                       Vacant land
Improvements:                    None
Highest and best use:            Residential/agricultural


Location:                        Section 29, Baldwin Rd., Grand Blanc
Site size:                       Approximately 60 acres
Zoning:                          AG/RE agricultural residential
Occupancy:                       Vacant land
Improvements:                    None
Highest and best use:            Residential


Location:                        North Side of Hill Road, east of Genesee Road, Grand Blanc
Site size:                       22.67 acres
Zoning:                          B-1 (Local business district-commercial)
Occupancy:                       Vacant land
Improvements:                    None
Highest and best use:            Multi family--condominium


As to the other parcels of the subject property, none of which the appraisers inspected, the appraisers did not use any of the valuation methods mentioned above to ascertain value.

The appraisers arrived at the values for this property by multiplying each property's State equalized value by 2. These parcels of property, for which the record does not disclose individual values or specifics other than general classifications of category, are set forth below by category:

Residential Rental Properties

142 Eddington, Flint
4492 American Heritage, Grand Blanc
2517 Torrence, Flint
2317 Humboldt, Flint
Wagonwheel, Grand Blanc
1421 Vermilya, Flint
829 Campbell, Flint
623 Neubert, Flint
3608 Dakota, Flint
2369 E. Hill Rd., Grand Blanc
1117 Neubert, Flint
1116 Victoria, Flint
5255 Perry Rd., Grand Blanc
5273 Perry Rd., Grand Blanc
1127 Belsay Rd., Grand Blanc

Vacant Land

2269 E. Hill Rd., Grand Blanc
Ottawa Park Lots, Grand Blanc
Bushdale Lots, Fenton Rd., Flint
Branda (Green Valley), Grand Blanc
Lot 33 Lapeer Heights, Burton
Land next to Victoria Shopping Mall, Grand Blanc
Lake of the north, lot 296, Pineview No. 2, Antrim County

Developed Property Held For Sale--Residential Lots

Kings Pointe--Swamp Lot, Grand Blanc
Kings Pointe--Lot 180, Grand Blanc
Kings Pointe--Lot 296, Grand Blanc
Kings Pointe--Lot 330, Grand Blanc
Kings Pointe--Lot 331, Grand Blanc
Kings Pointe--Lot 332, Grand Blanc
Kings Pointe--Lot 333, Grand Blanc
Kings Pointe--Lot 336, Grand Blanc

Kings Pointe--Lot 342, Grand Blanc
Kings Pointe--Lot 343, Grand Blanc

Developed Property Held For Sale--Other

Tri-Park Property
Grand Pointe Property

After the estate received the appraisers' list of values for each parcel of the subject property, the estate paid $14,003 to John J. Stockdale (Mr. Stockdale), a certified public accountant (C.P.A.) and appraiser of business interests, to appraise the decedent's equity interests, taking into account the value of the real estate as ascertained by the appraisers and any discounts considered appropriate by Mr. Stockdale. Mr. Stockdale ascertained that certain discounts, one of which was not a discount for market absorption, inhered in the equity interests. The discounts ascertained by Mr. Stockdale, and the interests to which they attached, are as follows: (1) The decedent's 5-percent interest in Grand Pointe, Inc.--35-percent discount for lack of marketability and lack of control, (2) the decedent's 26-percent interest in The Aukers, Community Developers, Ltd.--35-percent discount for lack of marketability and lack of control, (3) the decedent's 35.08-percent interest in Eldon L. Auker Enterprises--35-percent discount for lack of marketability and lack of control, (4) each 50-percent interest in Auker Homes--40 percent discount for lack of marketability and lack of control, (5) the 20.27-percent interest in Eldon L. Auker

Enterprises held by The Aukers, Community Developers, Ltd.--35-percent discount for lack of marketability and lack of control, (6) the 25.57-percent interest in Eldon L. Auker Enterprises held by Auker Investments, Inc.--35-percent discount for lack of marketability and lack of control, and (7) the 20.27-percent interest in Eldon L. Auker Enterprises held by The Aukers, Community Developers, Ltd.--35-percent discount for lack of marketability and lack of control.

The estate did not use Mr. Stockdale's values on the decedent's Federal estate tax return. After receiving Mr. Stockdale's values, the estate asked its accounting firm of Rachor, Purman & Tucker, C.P.A.'s (Rachor, Purman), to apply market absorption discounts in addition to the discounts ascertained by Mr. Stockdale. Rachor, Purman applied a 15-percent market absorption discount to each parcel of the subject property, and the estate reported the values ascertained by Mr. Stockdale, as adjusted by these 15-percent discounts, on the decedent's Federal estate tax return. The decedent's Federal estate tax return reported that the applicable value of the decedent's gross estate for Federal estate tax purposes was $5,592,994, and that the decedent's taxable estate totaled $3,968,403. The estate estimated that it would pay Rachor, Purman a total of $170,000 for their services in accounting for the estate. Whereas the estate paid Allied Real Estate

Appraisers, Inc., and Mr. Stockdale to appraise the subject property, Rachor, Purman's services did not include an appraisal of any of the subject property.

The estate reported the following assets at the values set forth below:

| | |
|---|---|
| Eldon L. Auker Enterprises | $641,000 |
| The Aukers, Community Developers, Ltd. | 144,000 |
| Auker Investments, Inc. | 467,000 |
| K.A.A., Inc. | - 0 - |
| Grand Pointe, Inc. | 18,000 |
| The apartment complexes | 2,133,953 |

These values were derived as follows:

Eldon L. Auker Enterprises

(1) The estate reduced by $270,563 the $3,878,544 asset value ascertained by the appraisers to take into account a 15-percent market absorption discount on the real estate interests owned by Eldon L. Auker Enterprises or by Auker Homes, an entity in which Eldon L. Auker Enterprises owned a 50-percent interest. The real estate interests owned by Eldon L. Auker Enterprises, and to which the estate applied 15-percent market absorption discounts aggregating $139,960, were as follows: Commercial rental property (Burger King) valued at $303,500, commercial rental property (Gingerbread House) valued at $113,000, 100-percent interest in residential rental properties valued at $191,800, 50-percent interest in residential rental properties valued at $93,440, 100-percent interest in vacant land valued at $55,000, 50-percent interest in vacant land valued at

$135,160, and 33.3-percent interest in vacant land valued at $41,166. The real estate interests owned by Auker Homes, and to which the estate applied 15-percent market absorption discounts aggregating $435,346 ($130,603 of which was attributed to Eldon L. Auker Enterprises after taking into account its 50-percent ownership interest and the 40-percent discount ascertained by Mr. Stockdale for lack of marketability and lack of control), were as follows: Commercial rental property valued at $775,000, commercial rental property valued at $600,000, commercial rental property valued at $515,000, commercial rental property valued at $140,000, residential rental properties valued at $263,930, developed residential lots held for sale valued at $370,170, and land held for sale valued at $283,200.

(2) The estate ascertained the value of the decedent's 35.08-percent interest in Eldon L. Auker Enterprises by subtracting Eldon L. Auker Enterprises' liabilities of $797,588 from its adjusted asset value of $3,607,981 ($3,878,544 - $270,563) and multiplying the balance of $2,810,393 by .3508 to arrive at $985,886.

(3) The estate reduced the $985,886 amount by the 35-percent discount ascertained by Mr. Stockdale for lack of marketability and lack of control and rounded the $640,826 balance up to $641,000.

Auker Investments, Inc.

(1) The estate reduced by $45,000 the $512,000 asset value ascertained by the appraisers to take into account 15-percent market absorption discounts on the real estate interests owned by Eldon L. Auker Enterprises, an entity in which Auker Investment, Inc., owned a 25.57-percent interest, and 15-percent market absorption discounts on the real estate interests owned by Auker Homes, an entity in which Eldon L. Auker Enterprises owned a 50-percent interest.  The real estate interests owned by Eldon L. Auker Enterprises, and to which the estate applied 15-percent market absorption discounts aggregating $270,563 ($45,000 of which was attributed to Auker Investments, Inc., after taking into account its 25.57-percent ownership interest, the 35-percent discount ascertained by Mr. Stockdale for lack of marketability and lack of control, and rounding), were set forth above in the discussion of Eldon L. Auker Enterprises.  The real estate interests owned by Auker Homes, and to which the estate applied 15-percent market absorption discounts aggregating $435,346 ($130,603 of which was attributed to Eldon L. Auker Enterprises after taking into account its 50-percent ownership interest, the 40-percent discount ascertained by Mr. Stockdale for lack of marketability and lack of control, and rounding), were also set forth above in the same discussion.

(2) The estate ascertained the value of the decedent's 100-percent interest in Auker Investments, Inc., by subtracting Auker Investment, Inc.'s liabilities of zero from its adjusted asset value of $467,000 ($512,000 - $45,000) to arrive at $467,000.

K.A.A. Inc.

(1) The estate reduced by $2,610 the $240,841 asset value ascertained by the appraisers to take into account a 15-percent market absorption discount on K.A.A., Inc.'s 100-percent interest in vacant land valued at $17,400.

(2) The estate ascertained the value of the decedent's 25-percent interest in K.A.A., Inc., by subtracting K.A.A., Inc.'s liabilities of $226,511 from its adjusted asset value of $238,231 ($240,841 - $2,610) to arrive at $11,720 and then multiplying the balance by .25. The estate reported that the balance equaled zero.

Grand Pointe, Inc.

(1) The estate reduced by $477,750 the $3,285,942 asset value ascertained by the appraisers to take into account 15-percent market absorption discounts on Grand Pointe, Inc.'s commercial rental property valued at $525,000 and land under development held for sale valued at $2,660,000.

(2) The estate ascertained the value of the decedent's 5-percent interest in Grand Pointe, Inc., by subtracting Grand Pointe, Inc.'s liabilities of $2,258,664 from its adjusted asset value of $2,808,192 ($3,285,942 - $477,750) to arrive at $549,528 and then multiplying the balance by .05 to arrive at $27,476.

(3) The estate reduced the $27,476 amount by the 35-percent discount ascertained by Mr. Stockdale for lack of marketability and lack of control and rounded the $17,859 balance up to $18,000.

Apartment Complexes

(1) The estate reduced by $3,310,800 the $22,072,000 aggregate value of the apartment complexes ascertained by the appraisers ($8,172,000 + $9,190,000 + $4,710,000) to take into account 15-percent market absorption discounts.

(2) The estate added $243,697 to the adjusted value of $18,761,200 ($22,072,000 - $3,310,800) to reflect other assets attributable to the apartment complexes and subtracted $16,870,944 from the resulting amount to reflect the apartment complexes' total liabilities.

(3) The $2,133,953 net fair market value of the apartment complexes ($19,004,897 - $16,870,944), as reported by the estate, is broken down as follows:

|                                                          | The Landings | Fox Hill | Stonehenge | Total |
|----------------------------------------------------------|-------------|----------|------------|-------|
| Value of apartment complexes as ascertained by the appraisers | $8,172,000 | $9,190,000 | $4,710,000 | $22,072,000 |
| Market absorption discount @ 15% | (1,225,800) | (1,378,500) | (706,500) | (3,310,800 |
| Value of apartment complexes after discount | 6,946,200 | 7,811,500 | 4,003,500 | 18,761,200 |
| Other assets | 48,257 | 188,975 | 6,465 | 243,697 |
| Total liabilities | (6,768,483) | (6,462,079) | (3,640,382) | (16,870,944) |
| Net fair market value | 225,974 | 1,538,396 | 369,583 | 2,133,953 |

Respondent made the following relevant adjustments:

|                             | Reported Value | Determined Value |
|-----------------------------|----------------|------------------|
| Eldon L. Auker Enterprises  | $641,000       | $703,000         |
| Auker Investments, Inc.     | 467,000        | 512,000          |
| K.A.A., Inc.                | 0              | 14,000           |
| Grand Pointe, Inc.          | 18,000         | 33,000           |
| Apartment complexes         | 2,133,953      | 5,727,267        |

Respondent's adjustments stem primarily from disallowing the market absorption discounts claimed by the estate. For some unexplained reason, respondent did not adjust the large discounts ascertained by Mr. Stockdale for lack of marketability and lack of control.

During his life, the decedent helped administer all the subject property, and he was a focal point in each of the businesses that held the property. Shortly after his death, many people expressed interest in whether the subject property would be sold or retained by the estate or beneficiaries thereof. These interested persons included local and Detroit-based real estate agents who inquired as to whether the subject property would be marketed for sale, and whether they could get information on any of the real estate that would be, or was, offered for sale. The estate anticipated that other people would be calling with respect to the subject property.

Ms. Auker-Cooper, who during the life of the decedent assisted him in most transactions concerning the subject property, never pursued any of these inquiries. Ms. Auker-Cooper never attempted, or intended, to sell (or cause an entity to sell) any of the subject property following the decedent's death.

The apartment complexes comprised in the aggregate approximately: (1) 19 percent of the total number of comparable complexes in Genesee County, (2) 20 percent of the total number of comparable units in Genesee County, and (3) 23 percent of the total assessed value of comparable complexes in Genesee County. Sales of real property in Genesee County totaled $224,118,947, $233,473,144, $254,681,378, $334,900,262, $416,229,204, $467,763,158, and $484,248,800 in 1990 through 1996, respectively. Of the total sales in 1992, which were 4,015 in number, $7,725,174 was attributable to vacant land (321 sales), $2,168,270 to income-producing property (42 sales), and $2,706,475 to commercial property (39 sales). Most of the other sales during 1992 were attributable to the sale of owner-occupied homes.

                              OPINION

Disputes over valuation fill our dockets, and for good reason. We approximate that 243 sections of the Code require fair market value estimates in order to assess tax liability, and that 15 million tax returns are filed each year on which taxpayers report an event

involving a valuation-related issue.  It is no mystery, therefore, why valuation cases are ubiquitous.  Today, valuation is a highly sophisticated process.  We cannot realistically expect that litigants will, will be able to, or will want to, settle, rather than litigate, their valuation controversies if the law relating to valuation is vague or unclear.  We must provide guidance on the manner in which we resolve valuation issues so as to provide a roadmap by which the Commissioner, taxpayers, and valuation practitioners can comprehend the rules applicable thereto and use these rules to resolve their differences.  Clearly articulated rules will also assist appellate courts in their review of our decisions in the event of an appeal.

We decide whether a market absorption discount applies to any of the subject property, mindful that the estate bears the burden of proof and that the presence of a market absorption discount is never presumed.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); see <u>Estate of Gilford v. Commissioner</u>, 88 T.C. 38, 57 (1987); see also <u>Rushton v. Commissioner</u>, 498 F.2d 88 (5th Cir. 1974), affg. 60 T.C. 272 (1973); <u>Maytag v. Commissioner</u>, 187 F.2d 962 (10th Cir. 1951), affg. a Memorandum Opinion of this Court; <u>Staley v. Commissioner</u>, 41 B.T.A. 752, 775 (1940); <u>Estate of Sawade v. Commissioner</u>, T.C. Memo. 1984-626, affd. 795 F.2d 45 (8th Cir. 1986). The estate argues that a 15-percent market absorption discount applies to each parcel of the subject property.  The estate claims

that a sale of all this property at once would depress the market and force a seller to accept less for the property than the seller would otherwise receive if the properties were sold separately over time. Respondent counters that a market absorption discount should not be applied in this case. Respondent claims that the estate has failed to show that skilled brokers could not sell all the subject property in a reasonable time. Respondent claims that the apartment buildings could be sold to one buyer to allow the buyer to take advantage of economies of scale. Respondent claims that the economic condition of the subject market has no bearing on the application of a market absorption discount under the facts herein because the market's economic condition has been taken into account in ascertaining the parties' stipulated values.

We do not agree with either party in all regards. Fair market value is a question of fact, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. 892, 896 (1986); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value is measured on the applicable valuation date, which, in this case, is the date the decedent died. See Estate of Proios v. Commissioner, T.C. Memo. 1994-442; see also

Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506. Fair market value is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person compelled to buy or to sell. United States v. Cartwright, 411 U.S. 546, 551 (1973); Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); see also sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities, and the characteristics of these hypothetical persons are not always the same as the personal characteristics of the actual seller or a particular buyer. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). The views of both hypothetical persons are taken into account, and focusing too much on the view of one of these persons, to the neglect of the view of the other, is contrary to a determination of fair market value. See, e.g., Pabst Brewing Co. v. Commissioner, supra; Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997); Estate of Cloutier v. Commissioner, T.C. Memo. 1996-49.

Relevant evidence of value may include consideration of a market absorption discount. Such a discount emanates from the law of blockage, under which courts and the Commissioner have long

recognized that the sale of a large block of publicly traded stock over a reasonable period of time usually depresses the price for shares of that stock as quoted on the market.[10]  See, e.g., <u>Maytag v. Commissioner</u>, <u>supra</u> at 965; <u>Commissioner v. Estate of Stewart</u>, 153 F.2d 17, 18-19 (3d Cir. 1946), affg. a Memorandum Opinion of this Court; <u>Groff v. Munford</u>, 150 F.2d 825, 827-828 (2d Cir. 1945); <u>Phipps v. Commissioner</u>, 127 F.2d 214, 216-217 (10th Cir. 1942), affg. 43 B.T.A. 1010 (1941); <u>Helvering v. Maytag</u>, 125 F.2d 55, 63 (8th Cir. 1942), affg. a Memorandum Opinion of this Court; <u>Page v. Howell</u>, 116 F.2d 158 (5th Cir. 1940); <u>Gamble v. Commissioner</u>, 101 F.2d 565 (6th Cir. 1939), affg. 33 B.T.A. 94 (1935); <u>Helvering v. Kimberly</u>, 97 F.2d 433, 434 (4th Cir. 1938), affg. per curiam a Memorandum Opinion of this Court; <u>Helvering v. Safe Deposit & Trust Co.</u>, 95 F.2d 806, 811-812 (4th Cir. 1938), affg. 35 B.T.A. 259 (1937); <u>Commissioner v. Shattuck</u>, 97 F.2d 790, 792 (7th Cir. 1938); <u>Estate of Damon v. Commissioner</u>, 49 T.C. 108, 117 (1967); <u>Standish v. Commissioner</u>, 8 T.C. 1204, 1210-1212 (1947); <u>Avery v. Commissioner</u>,

---

[10] "Blockage" is the "Recognition in the field of taxation of fact that in some instances a large block of stock cannot be marketed and turned into cash as readily as a few shares.  * * * The discount at which a large block of stock sells below the price of a smaller block is blockage."  Black's Law Dictionary 172 (6th ed. 1990); see also <u>Campbell v. United States</u>, 228 Ct. Cl. 661, 661 F.2d 209, 219 n.12 (1981).  The term "market absorption" is more commonly used in the valuation industry to describe the blockage effect on assets other than stock.  We use the term "market absorption" when we refer to blockage as applied to assets other than stock.

3 T.C. 963, 970-971 (1944); Estate of McKitterick v. Commissioner, 42 B.T.A. 130, 136-137 (1940); sec. 20.2031-2(e), Estate Tax Regs.;[11] sec. 25-2512-2(e), Gift Tax Regs. (language similar to that in sec. 20.2031-2(e), Estate Tax Regs.).  In other words, the quoted price for shares of a certain type of stock generally reflects the selling price of a relatively small number of those shares, and the presence on the market of a sufficiently large number of those shares tends to depress the quoted price.  The market can handle only a certain number of shares of a given stock at a quoted price, and, when a seller attempts to sell more shares than the market can handle, the large block of shares tends to flood the market, forcing the seller to accept a price for all shares that is less than the price set by

---

[11] As stated in sec. 20.2031-2(e), Estate Tax Regs.:

Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value.  In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued.  If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations.  * * *  On the other hand, if the block of stock to be valued represents a controlling interest, either actual or effective, in a going business, the price at which other lots change hands may have little relation to its true value.

the market for some of those shares.  As explained in an opinion of

the Court of Appeals for the Second Circuit authored by Judge

Augustus Hand:

> It is common knowledge that sales of small lots of
> stock on an exchange afford no reliable criterion of value
> per share for large lots which if disposed of rapidly are
> likely to flood the market and thus depress the price.
> Every skillful broker who wishes to dispose of a block of
> stock larger than the market is likely to absorb without
> sacrifice in price will liquidate slowly by sales of small
> units.  If he disposes of the stock too slowly, he runs the
> risk that a recession in current prices may occur and that
> the prices of his sales may suffer on that account.  If he
> sells too quickly, he is likely to suffer from forcing an
> amount of stock on the market which exceeds the normal
> demand, so that purchasers will only buy at less than going
> rates.  That "the size of the gift of any security is not a
> relevant factor" for consideration in determining market
> value, as the Regulations in force in 1936 prescribed, is
> quite contrary to experience.  If the block is large enough
> and the market thin, size under ordinary circumstances will
> certainly count.  To be sure some unusual factor like a
> struggle for corporate control might cause a large block to
> sell at a higher rate than would a small lot had no such
> struggle begun, but the size of the block to be offered is
> surely a matter for consideration in finding value.
> [Groff v. Munford, supra at 827.]

This Court has expanded the concept of blockage to the sale of

other assets such as art, Calder v. Commissioner, 85 T.C. 713,

722-723 (1985) (market absorption discount applied to gifts of a

large number of works of art created by one artist); Estate of Smith

v, Commissioner, 57 T.C. 650, 658 (1972) (market absorption discount

applied to 425 works of art created by and kept in sculptor's

collection), affd. on other grounds 510 F.2d 479 (2d Cir. 1975);

Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210 (market

absorption discount applied to approximately 400 works or groups of works of art); sheet music, <u>Rimmer v. Commissioner</u>, T.C. Memo. 1995-215 (market absorption discount applied to charitable contribution of collection of sheet music containing approximately 85,000 pieces); manuscripts, <u>Jarre v. Commissioner</u>, 64 T.C. 183 (1975) (market absorption discount applied to charitable contribution of large collection of original music manuscripts and other related material); books, <u>Skripak v. Commissioner</u>, 84 T.C. 285, 324 (1985) (market absorption discount applied to charitable contribution of large collection of books); animal trophies, <u>Epping v. Commissioner</u>, T.C. Memo. 1992-279 (market absorption discount applied to charitable gift of mainly animal mounts); <u>Estate of Miller v. Commissioner</u>, T.C. Memo. 1991-515 (market absorption discount applied to donation of animal trophies), affd. without published opinion 983 F.2d 232 (5th Cir. 1993); and real estate, <u>Estate of Sturgis v. Commissioner</u>, T.C. Memo. 1987-415 (20-percent market absorption discount applied to 11,298.86 acres of undeveloped land); <u>Carr v. Commissioner</u>, T.C. Memo. 1985-19 (30-percent market absorption discount applied to 175 developed lots; no discount applied to 437.5 undeveloped lots); <u>Estate of Folks v. Commissioner</u>, T.C. Memo. 1982-43 (20-percent market absorption discount applied to five leased lumberyards with the same tenant and in the same geographical area); <u>Estate of Grootemaat v. Commissioner</u>, T.C. Memo. 1979-49 (15-percent market

absorption discount applied to undeveloped lots totaling 302 acres). The law of supply and demand supports our application of the concept of blockage to these assets in that a sale of an exceptionally large block of one type of property may generate less proceeds than if the seller were to sell each piece of that block separately at the market price. The market may only handle so many pieces of one type of property in a limited time, and, when the tendered number of a single type of property is greater than the number that the market can absorb, the market is unable to handle the exceptionally large block at that time. Thus, a seller desiring to sell such a large block at that time may be forced to sell the block at a price per piece that is less than the quoted price for each piece.

Respondent and the estate both rely on the testimony of experts to support their respective positions on the presence in this case of the market absorption discount. We have wide discretion when it comes to accepting the testimony of an expert. Sometimes, he or she will help us decide a case. See, e.g., Booth v. Commissioner, 108 T.C. 524, 573 (1997); Trans City Life Ins., Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C. Ltd. v. Commissioner, T.C. Memo. 1997-96. Other times, he or she will not. See, e.g., Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331; Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). We weigh an expert's testimony in light

of his or her qualifications and with proper regard to all other credible evidence in the record.  We may accept or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion which we choose to adopt.  Helvering v. National Grocery Co., 304 U.S. at 294-295; Parker v. Commissioner, 86 T.C. 547, 562 (1986); see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.

We turn to the qualifications and testimony of the four witnesses whom the Court recognized as experts for purposes of this proceeding.  First, the Court recognized Mark J. Perry, Ph.D. (Dr. Perry), as an expert on economics with specialized knowledge on the economy of Genesee County in 1992.  Dr. Perry received a bachelor of arts in finance and a master of business administration in finance in 1985 and 1987, respectively, and he received a master of arts in economics and a Ph.D. in economics in 1991 and 1993, respectively. He has taught finance and economics at the university level from 1991 to date, and his employment in the real estate industry consists of working as a real estate broker from 1982 through 1987 in the area of St. Paul, Minnesota.  He currently teaches at the Flint campus of the University of Michigan as an assistant professor of economics and finance, and he has been in Genesee County for approximately 1 year.

Dr. Perry was retained by the estate to examine the economic conditions in Genesee County from 1990 through 1996, focusing on 1992 vis-a-vis the remaining 6 years.  Dr. Perry testified that the U.S.

economy suffered a recession from July 1990 through March 1991 and that a recession in Genesee County began at the same time, but did not end until late 1993.  Dr. Perry testified that a "recession" occurs whenever the gross domestic product decreases for two consecutive quarters.  Dr. Perry ascertained the following seven facts concerning the condition of the commercial real estate market in Genesee County and concluded that these facts affected negatively the condition of that market and the real estate values therein: (1) The average annual increase in rent for one- and two-bedroom apartments in Genesee County for 1987, 1989, 1991, and 1992 was less than the rate of inflation for the corresponding year, (2) rental income from the apartment complexes decreased from 1987 through 1992, (3) Fox Hill's vacancy rate was slightly higher than the average for the Grand Blanc area, (4) the office vacancy rates in Flint and Grand Blanc were 21 and 17 percent, respectively, (5) investment in apartment buildings between 1986 and 1992 declined nationally, (6) the rate of return on investments in apartment buildings declined nationally between 1990 and 1992, and the rate of return was negative in 1992, and (7) the economy in Genesee County was heavily dependent upon the automobile industry during the years under his review, and an economic contraction in this industry from 1990 through 1993 had a negative impact on the economy in Genesee County during those years.

Second, the Court recognized Steven Jon Shanker, C.P.A. (Mr. Shanker), as an expert on the market absorption discount. The estate retained the accounting firm of Coopers & Lybrand, L.L.P., to ascertain the rate of the market absorption discount that applied to each parcel of the subject property, and Mr. Shanker, a partner in that firm who specializes in valuation, was assigned the job. Mr. Shanker has a Bachelor of Arts in Accounting and a Master of Business Administration in Taxation, and he is a senior member in the business valuation area of the American Society of Appraisers. He has never appraised real estate or applied a market absorption discount to real estate (before the instant case), but he has valued many entities whose assets included real estate and has been involved in numerous blockage situations related to the valuation of stock. Many (if not all) of the entities valued by Mr. Shanker were his clients.

Mr. Shanker concluded that a 20-percent market absorption discount applied to each parcel of the subject property. In so doing, he reviewed the appraisers' appraisals and financial, economic, and census data on Genesee County real estate. He analogized an underwriter's role in disposing of stock to the role of the Resolution Trust Corporation (RTC) in disposing of real estate; Congress formed the RTC to dispose of real estate held by insolvent savings and loan institutions (S&L's). He concluded that "It would

be improper to determine Fair Market Value of a large block of real estate on a market comparable method of single parcels of real estate without applying a discount."

Mr. Shanker performed a four-factor analysis in reaching his conclusion on the applicability of a 20-percent discount. He began by analyzing the depth of the market. He stated:

> Depth of the market can be described as the quantity of transactions, interest in the properties, and potential activity both on the buying and the selling sides of the market. Depth is a product of many factors, including the total amounts of properties, the breadth of distribution among the general public and the overall activity in the market. If the block is so large that it would be difficult to sell over a short period, the application of a market absorption discount is necessary to arrive at Fair Market Value.

Mr. Shanker concluded that the applicable market at hand had a "limited market depth" because the appraisers had to look outside the Genesee County area to find data on comparable sales. Mr. Shanker concluded that this factor was a "strong indicator" that a market absorption discount should be applied to the subject property.

Mr. Shanker then analyzed the size of the subject property vis-a-vis the total property in the market in terms of both the actual number of properties being sold and the level of activity in the market. He concluded that this factor favored applying a market absorption discount to the subject property. He stated that the apartment complexes totaled approximately 20 percent of the comparable apartment market based on number of units. He stated that

real estate in the Flint area totaled $1.5 billion, excluding real estate owned by GM, and approximately $2.2 billion if GM was included. He stated that reported real estate sales in Genesee County totaled $255 million in 1992.

Mr. Shanker next analyzed the amount of time that was needed to dispose of the subject property and concluded that this factor supported applying a market absorption discount.[12] He looked to each parcel of the subject property separately and concluded that it would take 18 months to sell each parcel. He stated that the appraisers assumed that each parcel of the subject property had to be marketed for 18 months in order to sell it.

Mr. Shanker then analyzed the trend of the market as it applied to a blockage discount. According to Mr. Shanker, an upward trend in the market indicates that a block of shares can be sold at the quoted price within a reasonable amount of time, which negates the applicability of a blockage discount, while a downward trend leads to the contrary proposition. He concluded that this factor supported applying a market absorption discount to the subject property. He stated that the value of real estate in Flint peaked in 1990 at $2.35 billion and declined to $2.25 billion at the end of 1992.

After analyzing his factors and concluding that a market absorption discount applied to the subject property, Mr. Shanker

---

[12] Mr. Shanker believes that a market absorption discount applies to any asset if it takes more than 6 months to sell it.

turned to ascertaining the amount of this discount.  He analyzed nine RTC transactions that occurred in Michigan from December 28, 1990, through July 20, 1992, and ascertained that these properties sold at discounts from appraised values ranging from 11 to 94 percent, with a mean of 31 percent and a median of 20 percent.  Mr. Shanker settled on a discount rate of 20 percent.  Mr. Shanker reviewed some court cases and some academic studies on blockage discount to assure himself that 20 percent was the correct discount rate.

The third witness whom the Court recognized as an expert was Douglas K. Hodge, MAI, ARA (Mr. Hodge).[13]  Mr. Hodge was retained by respondent to complete a market absorption study on the apartment complexes, and we recognized Mr. Hodge as an expert on real estate appraisals, including the applicability of a market absorption discount.  Mr. Hodge has been the president of Hodge Appraisal Group, Ltd., from 1991 to date, he received a bachelor of science in finance in 1983, and he has lived in Michigan all his life.  He began appraising real estate in 1983, and he is a certified real estate appraiser in the States of Michigan, Ohio, and Colorado and an ASA candidate with the American Society of Appraisers.  He has valued a number of multifamily, retail, and industrial properties in the Flint area, and he has valued many large apartment complexes in Genesee

---

[13] The designation of ARA is awarded to qualifying members of the American Society of Farm Managers and Rural Appraisers, and it is the highest professional designation offered by that society.

County.  He has testified as an expert in probate court, circuit courts, Federal bankruptcy court, and this Court.

Mr. Hodge concluded that a market absorption discount did not apply to any of the apartment complexes mainly because no discount would be necessary in order to market the properties, given an adequate and standard marketing period of 4 to 6 months.[14]  Before writing his report, which was received in evidence, Mr. Hodge toured the apartment complexes, and he researched extensively the economics and demographics of both Genesee County and the apartment complexes in that county.  He also spoke to potential investors and to brokers as to the amount of time that the apartments would have to be marketed in order to sell them.

Mr. Hodge spent approximately 90 hours, or more than twice the amount of time spent by Mr. Shanker, in examining the applicability of a market absorption discount to the apartment complexes. Mr. Hodge ascertained from market data that properties such as the apartment complexes have an appeal outside the general community, and that one- or two-apartment complexes in Genesee County which were similar to the complexes at issue sold to nonindividual investors between the years 1990 and 1995.  Mainly, Mr. Hodge concluded, investors purchase apartment complexes like the ones at hand as part of an investment vehicle such as a real estate investment trust.

---

[14] In fact, Mr. Hodge concluded, an investor could pay a premium to acquire all three complexes.

Fourth, the Court recognized Bruce G. Pollack (Mr. Pollack), who the estate called as a rebuttal witness, as an expert in the real estate industry, but whose expertise did not extend to the appraisal of real estate. Mr. Pollack is a realtor, and he serves as the president of a general real estate brokerage business that bears his name. He began his real estate career in 1948 in Genesee County and has continued to work in that county ever since, specializing in general commercial real estate since 1966. He has handled approximately $200 million of real estate in his 49-year career. He testified that it would have taken him from 3 to 10 years to sell all three apartment complexes in 1992 at their "appraisal value", and that he uses the term "appraisal value" to mean "a ready, willing and able purchaser and a ready, willing and able seller get together and determine to do business and arrive at a price with no duress, no pushing from either side."

We do not find any of these experts to be extremely helpful to us. With respect to Dr. Perry, his testimony goes directly to the subject property's market value (i.e., fair market value without regard to a market absorption discount), and the parties have agreed that the properties' market values equal the amounts ascertained by the appraisers. The appraisers knew about the economic condition of Genesee County at the time of the decedent's death, and they took this condition into account when they formulated their opinion on

each property's market value.  The same is true with respect to the
seven facts ascertained by Dr. Perry on the condition of the real
estate market in Genesee County.  The appraisers knew about each of
these facts at the time of their appraisals, and we find nothing in
the record to persuade us that they did not give each of these facts
proper regard in arriving at their values.  Discounting the
appraisers' values to reflect the economic condition in Genesee
County on the applicable valuation date, as the estate asks us to do,
would be to double count this effect.  See Estate of Gilford v.
Commissioner, 88 T.C. 38, 58 n.25 (1987).  We decline to do so.[15]

Nor are we satisfied with the testimony of Mr. Shanker.  To be
sure, he is biased.  He works professionally valuing assets for his
clients, and we would be advancing his interests as well as the
interests of his clients were we to adopt blindly his opinion, which
is unsupported by the record, on the presence of an across-the-board
20-percent market absorption discount.  We decline to accept the
opinion of a man whose only appearance in this case seems to be as a
spokesman for the interests of his clients and the estate.
Laureys v. Commissioner, 92 T.C. 101, 129 (1989).  The Court informed
the parties at the start of Mr. Shanker's testimony that we had

---

[15] The estate also argues that market absorption discounts
are warranted because the apartment complexes had a high vacancy
rate and the rental rates were not keeping up with inflation.  We
reject these arguments for the same reason as above; namely, that
the appraisers took these factors into consideration in arriving
at their values.

concerns with his ability to testify persuasively on market absorption discount, and, now that we have heard his testimony and reviewed the record in full, our concerns have blossomed into firm convictions.

Even if we were to consider Mr. Shanker's opinion on its merits, we still would not adopt it. It is full of holes. First, he assumed incorrectly that the appraisers valued the subject property by a "market comparable method". The appraisers valued the apartment complexes on the basis of an income capitalization method, and they valued the remaining parcels of real estate on the basis of an assortment of methods, one of which was a sales comparison method. Second, he assumed incorrectly that the appraisers' values of the subject property were based on the necessity of marketing each parcel for 18 months. The only marketing periods taken into account by the appraisers were an 18-month period for each of the apartment complexes, a 1-year period for the Burger King property, and a 3-to-6-month period for the residential rental property at 6642 Kings Pointe, Grand Blanc. Third, he assumed incorrectly that any market absorption discount for the subject property could be tied directly to the RTC's disposition of real estate held by insolvent S&L's. The RTC was obligated to sell the S&L's real estate within a relatively short time; the hypothetical seller, on the other hand, has a reasonable time in which to sell the subject property. The RTC

information also pertained to properties that were not comparable to the subject property, and we do not know the length of time that the RTC marketed the properties before selling them.  Fourth, he assumed incorrectly that an across-the-board discount could apply to each parcel of the subject property.  We discuss below why this assumption is incorrect.  Fifth, he assumed incorrectly that a market absorption discount equals the difference between a property's appraised value and its actual sale value.  Although it is true that fair market value for Federal tax purposes could in certain cases equal a property's appraised value, this does not mean, as Mr. Shanker would have us hold, that a market absorption discount applies to that property to the extent that the property actually sells after the valuation date for less than its appraised value.  Sixth, he assumed incorrectly that a market absorption discount applies when competing properties, even if not comparable, are offered for sale in the same geographical market, and the properties cannot sell within 6 months. We discuss below why this assumption is incorrect, but note here that even the estate acknowledges in its brief that properties compete against each other only if similar.  Seventh, he acknowledged that there are individuals and organizations interested in investing large sums of money in apartment complexes, yet he spoke to no brokers about selling properties, or how they would go about selling the properties.  Nor did he perform any independent research on sales or

purchasers of apartment complexes on or before the applicable valuation date.  Eighth, he cites in his report numerous sales in 1990 through 1992 in which property sold for less than its appraised value, yet tells us almost nothing about the manner in which the appraised values were ascertained, let alone the situs or description of the property sold.

We also have concerns with the testimony of Mr. Hodge. The thrust of his opinion is that the apartment complexes had an appeal to investors outside the Genesee County area, and, that, given this fact, the apartment complexes were readily marketable.  Although we agree with Mr. Hodge that potential buyers may come from outside Genesee County, we simply do not believe that this fact, standing alone, means that a market absorption discount is inapplicable to this case.  We also have trouble with his conclusion that "investment vehicles" usually purchase large apartment complexes such as the ones at hand.  As a point of fact, only one of the five "comparable" complexes referenced by the appraisers in their analysis of the sales comparison method sold to an entity rather than an individual.

Finding none of the experts dispositive to our decision in this case,[16] we address the issue on the basis of the record before us,

---

[16] Mr. Pollack was merely a rebuttal witness, and he testified only to the fact that he would have needed 3 to 10 years to sell the apartments complexes.  His testimony does not mean that another broker, working alone or in concert with other brokers, would have been unable to sell the apartment complexes

(continued...)

which is abundant with data on the subject properties and their marketability.  In passing on whether a market absorption discount applies in the instant setting, and the amount of such a discount if it does apply, we utilize a five-part analysis.  First, we examine the assets to be valued and categorize these assets by type.  Second, we ascertain the market value (i.e., the fair market value without consideration of a discount for market absorption) of each asset in each category, assuming that each asset will be marketed separately. Third, we compare the number of assets in each category to the number of assets of that type which are traded in the market over a reasonable period of time.  Fourth, we ascertain how much longer than this reasonable time period it would take to sell at market value (as defined above) each asset that could not be sold in this reasonable time period.  Fifth, we discount the value of each asset in the category of assets that cannot be sold within a reasonable time period, taking into account the time value of money and the period of time that the category of assets would have to be marketed in order to sell each asset therein.

### 1.  Assets To Be Valued

We start by examining the assets to be valued and categorizing these assets by type.  Blockage applies to narrowly drawn classes; namely, shares of stock that are trading on an established market.

---

[16](...continued)
  more quickly.

See <u>Amerada Hess Corp. v. Commissioner</u>, 517 F.2d 75, 83 (3d Cir. 1975), revg. on other grounds <u>White Farm Equip. Co. v. Commissioner</u>, 61 T.C. 189 (1973). The fact that a seller may aim to sell shares of various classes of stock issued by a single corporation does not necessarily mean that blockage will occur when the total shares to be sold are greater than the demand for shares of one class but less than the demand for shares of all classes. The same rationale applies to the sale of real estate. The mere fact that many parcels of real estate are marketed contemporaneously does not mean that a discount for market absorption applies to any or all parcels. Vacant land, for example, is different than residential rental property, which, in turn, is different than commercial rental property. The market for vacant land, therefore, may not be affected directly by whether multiple parcels of residential and/or commercial rental property are also on the market. The same is not necessarily true when the parcels of real estate are the same general type, for example, multiple parcels of commercial rental property. Properties of the same general type will compete against each other when they are in the same market. To the extent that the market cannot absorb all parcels of one type of property, the value for a single parcel as set by the market without competition from similar parcels will usually be driven down.[17] See <u>Amerada Hess Corp. v. Commissioner</u>,

---

[17] In certain cases, the price may be driven up because the
(continued...)

supra at 83; Heiner v. Crosby, 24 F.2d 191, 193 (3d Cir. 1928).

The estate recognizes the fact that only similar properties compete against each other in the market.  The estate argues that parcels of real estate are similar when they are used for the same purpose, for example, as commercial rental property.  According to the estate, multiple pieces of similar use property will compete in the market, regardless of each parcel's personal characteristics, and a market absorption discount will apply when the market cannot absorb all competing properties.  We do not agree.  We believe that two or more parcels of real estate will compete against each other only when the parcels are essentially similar in attributes such as use, value, size, composition, and quality.

The estate, relying somewhat on the law of blockage as applied to stock, argues that an across-the-board discount of 15 percent applies to each parcel of the subject property.  We do not agree.  In the case of stock, the shares of a single class of stock are fungible, so the market draws no distinction between one share of that class and another.  Thus, a blockage discount that applies to

---

[17](...continued)
market may place a premium on owning multiple properties of that type.  Rushton v. Commissioner, 498 F.2d 88, 90 n.3 (5th Cir. 1974), affg. 60 T.C. 272 (1973); see Bankers Trust Co. v. United States, 207 Ct. Cl. 422, 518 F.2d 1210, 1222 n.8 (1975). Although the subject properties were associated with the decedent, a well-known developer, before his death, and much interest in the subject properties was shown following the decedent's death, we do not believe that a hypothetical buyer would have paid a premium to buy any of the subject property.

one share applies equally to every other share in that class. In the case of real estate, however, a different rule applies. No two parcels of real estate are the same. Thus, the application of a single discount to various parcels of dissimilar real estate, which by its very nature ignores the uniqueness of each parcel, is usually inappropriate. See Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210 (same rationale applied to works of art). Single rates of discount apply to each group of essentially similar assets.

We analyze the assets at hand. When he died, the decedent owned the apartment buildings and various interests in numerous entities that owned real estate or interests in other entities that owned real estate. The estate and Mr. Shanker ask us to look through the various interests that the decedent owned at the time of his death and conclude that the decedent owned 58 parcels of real estate. This we will not do. The decedent structured his business affairs so that the subject property was owned by various entities, rather than by him personally. We will not now disregard the separate entities and treat the decedent as owning all the subject property. Because the entities were viable going concerns on the applicable valuation date, and neither a sale nor a liquidation of the entity-owned real estate was contemplated at that time, we conclude that the entity-owned real estate is ineligible for a market absorption discount. See, e.g., Estate of Andrews v. Commissioner, 79 T.C. 938, 942 (1982), and the

cases cited therein.  Although the District Court in Obermer v.
United States, 238 F. Supp. 29 (D. Haw. 1964), did consider a
"'built-in' capital gains tax" in determining the value of a
corporate interest, as we explained in Estate of McCormick v.
Commissioner, T.C. Memo. 1995-371:

> We do not understand * * * [that case] to stand for a
> general legal principle requiring or even suggesting a
> separate discount or consideration of tax effect to the
> "willing buyer".  As we understand * * * [that case, it
> stands] for the principle that a willing buyer would
> consider the tax effects, among other things, in the
> process of price formulation.

As to the apartment complexes, these parcels of real estate may
qualify for a market absorption discount because they were owned
directly by the decedent.  We compare each complex's use, location,
size, age, quality, and value.  We compare the number and type of
units at each complex, and the size of the grounds and the amenities
offered thereon.  We find from our comparisons that each apartment
complex is essentially similar to each other apartment complex.
We conclude that the apartment complexes are in the same category,
and apply our remaining analysis to these three complexes.

### 2.  Market Value

We must determine the market value of each apartment complex,
assuming that each complex will be marketed separately.  We are
assisted in this case by the fact that the parties agree that the
market values of the complexes are the values ascertained by the

appraisers under an income capitalization method. Although a blockage or market absorption discount has almost always been applied when a market value was ascertained by a sales comparison method, see generally Bogdanski, Federal Tax Valuation par. 4.04[4], at 4-11 (1996), we believe that a market absorption discount may apply to market values ascertained by other methods.

We conclude that the market values of the apartment complexes are the values ascertained by the appraisers under the income capitalization method.

### 3. Assets Traded in the Market

We compare the number of apartment complexes owned by the decedent to the number of comparable apartment complexes that are traded in the market over a reasonable period of time. As has been previously observed, a market absorption discount is applied to property when the record contains "persuasive evidence that at the critical time the market was such that it could not absorb sales in the larger volume at the price level obtaining for small lots". Richardson v. Commissioner, 151 F.2d 102, 103 (2d Cir. 1945), affg. a Memorandum Opinion of this Court. We proceed to define the relevant market for the apartment complexes, and analyze whether the market could have handled a hypothetical sale of all three complexes.

The record reveals numerous sales of apartment complexes in the State of Michigan. With respect to sales in Genesee County, however,

we find little market activity in apartment complexes similar to the three at hand.  We conclude that the market could not have handled the sale of all three apartment complexes, the aggregate value of which was $22,072,000, even if the estate were afforded a limited period of time in which to market them.  To be sure, the appraisers came to the same conclusion.  They based their value of the complexes on the assumption that each complex would be marketed for 18 months.[18]  We also bear in mind that sales of real property in Genesee County totaled $254,681,378 in 1992, and that the annual growth in real estate sales in Genesee County was approximately 4.1 and 9.1 percent in 1991 and 1992, respectively, before ballooning to approximately 31.5 and 24.3 percent in 1993 and 1994, respectively.  Although a hypothetical person on the applicable valuation date would have known about an upward trend in sales and could have expected the upward trend to continue into 1993 and 1994, we do not believe that he or she could have predicted the large increases that occurred in 1993 and 1994.

    4.  Reasonable Time To Market

    We ascertain how long after the valuation date it would have taken to sell each apartment complex at its market value.  For blockage purposes, the test is not the amount of proceeds that

_____

    [18] Although the appraisers arrived at their values on the basis of a "competitive and open market", we read nothing in their reports to suggest that their competitive market included competition from the other subject properties.

numerous shares of stock would bring if each share was sold on the same day.  Estate of Van Horne v. Commissioner, 78 T.C. 728, 742 (1982), affd. 720 F.2d 1114 (9th Cir. 1983); see also Helvering v. Safe Deposit & Trust Co., 95 F.2d at 812.  The test is the amount that a hypothetical seller could realize if skilled brokers disposed of all shares in a reasonable period of time in accordance with prudent practices of liquidation.  See Richardson v. Commissioner, supra at 103; Mott v. Commissioner, 139 F.2d 317 (6th Cir. 1943), affg. a Memorandum Opinion of this Court; Helvering v. Maytag, 125 F.2d at 63; Bull v. Smith, 119 F.2d 490, 492 (2d Cir. 1941); Estate of Van Horne v. Commissioner, supra at 742; Frank v. Commissioner, 54 T.C. 75, 100 (1970), affd. 447 F.2d 552 (7th Cir. 1971); Estate of Prell v. Commissioner, 48 T.C. 67, 72 (1967).  We believe that the same test applies in ascertaining the presence of a market absorption discount.  If hypothetical brokers could have sold all essentially similar assets within a reasonable period of time after the valuation date, at the per-piece market rate, then no discount for market absorption is appropriate.  The assets could be absorbed by the market quickly, making the quoted market price the most representative indicium of the assets' value on the valuation date.  Rushton v. Commissioner, 498 F.2d 88, 92 n.10 (5th Cir. 1974), affg. 60 T.C. 272 (1973); Bankers Trust Co. v. United States, 207 Ct. Cl. 422, 518 F.2d 1210, 1222 (1975).

The amount of time that a hypothetical broker would need to dispose of assets is a factual question.  In Estate of Van Horne v. Commissioner, supra at 742, the Court found no blockage where stock could have been sold in small blocks without depressing the market "over a comparatively brief period of, at most, several weeks". Earlier, the Court in du Pont v. Commissioner, 2 T.C. 246, 253, 257 (1943), a Court-reviewed Opinion, valued a large block of stock based on market conditions existing over a 90-day period.  The Court of Appeals for the Second Circuit has indicated that the price that could have been obtained for a block of stock if the block had been liquidated over a 10-day period, without activity to develop the market, failed to establish the taxpayer's entitlement to a blockage discount.  Richardson v. Commissioner, supra at 104.

All in all, we believe that 6 months is the most time that a hypothetical broker should be given to dispose of the apartment complexes before a market absorption discount will inhere in their fair market value.  The appraisers assumed that each complex had to be marketed for 18 months in order to be sold, and they factored this 18-month period into their appraisals.  Although the appraisers knew of the presence of all three complexes, we do not believe that the appraisers meant for this 18-month period to be the period of time in which all three complexes would sell.  We believe it would take

18 months to sell one apartment complex.[19]  In other words, in the
18-month period following the applicable valuation date, a
hypothetical broker could sell either The Landings, Fox Hill, or
Stonehenge.  With respect to the other two complexes, we believe it
would take another 12 months to sell one of them, and another
12 months to sell the other one.  Because the dollar amount of real
estate sales in Genesee County was greater in 1992 than 1991, and
given the public's stated interest in the subject property, we do not
believe that a hypothetical broker would have needed as much time to
market the last two complexes, as the first.

### 5.  Applicable Discount

We must discount the value of each apartment complex that cannot
be sold within a reasonable time, taking into account the time value
of money and the time that each complex must be marketed in order to
be sold.  For purposes of our analysis, we use the following formula
to calculate the applicable present value rates:  $1 - (1 + i/n)^{-ny}$;
i equals the discount rate, n equals the number of months over which
the discount rate is compounded,[20] and y equals the number of years

---

[19] As to respondent's assertion that investors would most
likely buy the apartment complexes as a block, we find nothing in
the record supports this assertion.  The record merely shows that
many individuals and organizations were interested in investing
large sums of money in apartment complexes.

[20] To simplify our calculations, we compound monthly.

involved.  We round percentages to the third decimal point, and we round dollar amounts to the nearest dollar.

The appraisers factored an 18-month marketing period into their market value of each apartment complex.  Thus, we do not take the 18-month period after the applicable valuation date into account to arrive at the market absorption discount that applies herein.  We have concluded that it would take a total of 42 months to sell all three complexes, or, in other words, 18 months after the end of the 6-month reasonable period of time starting 18 months after the applicable valuation date.  Thus, one complex would sell within the reasonable time and the other two would not; of the two that would sell outside this time, one would sell 6 months after the end of it and the other would sell 18 months after the end of it.

The appraisers applied 9.738-percent capitalization rates to Stonehenge and Fox Hill and a 10.238-percent capitalization rate to The Landings in order to ascertain their values.  We believe that this capitalization rate reflects the time value of money, and that a weighted average of the rates (i.e., 9.905 percent) is the appropriate annual rate to use to determine the complexes' market absorption discount.  As to the base to which this rate is applied, we use the average market value of the three complexes.  We must determine how much lower than the market value a hypothetical seller will have to drop his or her price for each complex in order to sell all three within a reasonable time after the applicable valuation date.  It would be inappropriate to apply the full discount to all

three complexes because only two must be discounted in order to sell them within the reasonable time.  However, if we were to discount two complexes, but not the other one, the discounted complexes, which are essentially similar to the remaining complex, but for the discount, would sell and the complex that was not discounted would not.  To overcome this dilemma, we determine the discount on each complex that will not sell within the reasonable of time and apportion one-third of the aggregate discount to each complex so that a hypothetical buyer will buy all three complexes within the reasonable time. Because we are unsure which complexes will not sell within the reasonable time, we determine the discount on the basis of the complexes' average market value.

The complexes' average market value is $7,357,333 (($8,172,000 + $9,190,000 + $4,710,000)/3), and the discount rates for the complexes that will not sell for 30 and 42 months are 4.813 and 13.754 percent, respectively.  Thus, we apply a 6.189-percent discount to each apartment complex ((4.813% + 13.754%)/3).  The dollar discount for each of the complexes is as follows:

| | |
|---|---|
| The Landings | $505,765 ($8,172,000 x 6.189%) |
| Fox Hill | $568,769 ($9,190,000 x 6.189%) |
| Stonehenge | $291,502 ($4,710,000 x 6.189%) |

6.  Conclusion

A market absorption discount of 6.189 percent inheres in the fair market value of each apartment complex.  None of the other real estate is valued by reference to a discount for market absorption.

In reaching our conclusions, we have considered all arguments made by the parties, and, to the extent not addressed above, find them to be irrelevant or without merit.  To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.

